ORIGINAL

FILED
SEP 2 0 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**5860 CHICAGO RIDGE, LLC.**
**2428 West Bloomingdale**
**Chicago, IL 60647**

**Plaintiff,**

**v.**

**THE UNITED STATES**

**Defendant.**

**Case No.:** 07-680 C

**COMPLAINT**

Plaintiff 5860 Chicago Ridge, LLC ("Chicago"), by counsel, hereby files this Complaint against the UNITED STATES OF AMERICA, acting through the General Services Administration ("GSA"), and alleges and states as follows:

**PARTIES**

1. Chicago is an Illinois limited liability company with its principal place of business at 2428 West Bloomingdale, Chicago, Illinois 60647.

2. Defendant is the United States acting by and through the GSA, an agency of the United States Government. GSA's address is 1800 F. Street, N.W., Washington, DC 20405.

**JURISDICTION**

3. This Court has jurisdiction pursuant to the Contract Disputes Act ("CDA") 41 U.S.C. § 601-13 and the Tucker Act 28 U.S.C. § 1491.

**FACTS**

4. GSA and Chicago entered into Lease No. GS-05B-17003 ("Lease") on or about July 15, 2002 for a building to be built by Chicago at 5860 W. 111th St., Chicago, Illinois ("Building" or "Premises").

5. Chicago constructed the Premises, containing 17,250 rentable square feet in accordance with plans approved by GSA and its user agency, the Internal Revenue Service ("IRS" or "Tenant"). Pursuant to Supplemental Lease Agreement No. 3, the commencement date of the Lease was June 25, 2004, and the term was "10 years, 10 years firm."

6. The Lease incorporated by reference, *inter alia*, GSAR 552.270-10 Failure on Performance (SEP 1999) (General Clause 15) and GSAR 552.270-22 Default by Lessor During the Term (SEP 1999) (General Clause 16).

7. GSAR 552.270-10 Failure of Performance (SEP 1999) provides, in pertinent part:

> . . . In the event of any failure by the Lessor to provide any service, utility, maintenance, repair or replacement required under this lease the Government may, by contract or otherwise, perform the requirement and deduct from any payment or payments under this lease, then or thereafter due, the resulting cost to the Government, including all administrative costs. If the Government elects to perform any such requirement, the Government and each of its contractors shall be entitled to access to any and all areas of the building, access to which is necessary to perform any such requirement, and the Lessor shall afford and facilitate such access. Alternatively, the Government may deduct from any payment under this lease, then or thereafter due, an amount which reflects the reduced value of the contract requirement not performed. No deduction from rent pursuant to this clause shall constitute a default by the Government under this lease. These remedies are not exclusive and are in addition to any other remedies which may be available under this lease or at law.

8. GSAR 552.270-22 Default by Lessor During the Term (SEP 1999) states:

> (a) Each of the following shall constitute a default by Lessor under this lease:
>
> > (1) Failure to maintain, repair, operate or service the premises as and when specified in this lease, or failure to perform any other requirement of this lease as and when required provided any such failure shall remain uncured

for a period of thirty (30) days next following Lessor's receipt of notice thereof from the Contracting Officer or an authorized representative.
(2) Repeated and unexcused failure by Lessor to comply with one or more requirements of this lease shall constitute a default notwithstanding that one or all such failures shall have been timely cured pursuant to this clause.

(b) If a default occurs, the Government may, by notice to Lessor, terminate this lease for default and if so terminated, the Government shall be entitled to the damages specified in the Default in Delivery-Time Extensions clause.

9. The Lease incorporated by reference, *inter alia*, FAR 52.233-1 Disputes (General Clause 36).

10. The Lease incorporated by reference, *inter alia*, GSAR 552.270-26 No Waiver (as General Clause 7), which provides: "No failure by either party to insist upon the strict performance of any provision of this lease or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial rent or other performance by either party during the continuance of any such breach shall constitute a waiver of any such breach of such provision."

11. IRS took possession of the Premises on or about June 25, 2004 and occupied the Premises with only minor, punch list-type complaints until November 2004. Chicago adequately responded to each of these complaints.

12. Beginning in or after November 2004, GSA/IRS began complaining of other problems, primarily caused by water leaking into the space through the ceiling and occasionally the perimeter walls on the second floor, the majority of which problems have been remedied and the rest of which Chicago is continuing to repair. All of the problems with leaks identified by the IRS occurred in a limited area of the Building, and there was no Building-wide shut down due to leaks.

13. Chicago timely responded to each issue and alleged deficiency reported by GSA or

IRS, it took reasonable steps to repair the alleged deficiencies, and it spent considerable time and money doing so. Chicago is continuing to work to remedy any current problems.

14. Except for two offices and two or three work stations in the general office area under the rooftop HVAC unit, Chicago has repaired all of the areas where problems were manifested without further recurrence of the problem. In those few areas where there are still leaks , leakage has been dramatically reduced to the mere staining of tiles.

15. At various times IRS prevented Chicago from entering the building to determine the cause of the leaks. Even when IRS declared to Chicago that there was an emergency, Chicago was prevented from entering the building to assess the situation. IRS also cancelled meetings on site when Chicago's workmen had already arrived.

16. The majority of the problems experienced by IRS, including the water leaks, were minor and resulted in, at most, minimal disruption to IRS's ability to operate in virtually every area of the Premises on a continuous basis. The problems experienced by IRS did not interfere with the IRS's beneficial use of the office space or impede its ability to conduct business in a normal fashion. This included those operations that are confidential, or secure, in nature.

17. In September 2006, GSA notified Chicago that it was going to deduct $1,378.40 per month in rent for the loss of use of 515 square feet of space (out of 17,250 rentable square feet) of the Premises plus parking, which was GSA's estimate of the amount of space it contended it could not use because of alleged problems with the Premises. GSA made this reduction, which constitutes less than 3% of the Premises, despite the fact that it was not completely or continuously deprived of the use of any part or all of these 515 square feet.

18. In January 2007, and without prior notice to Chicago, GSA again reduced the rent, this time by a total of 10%, which was still not a material amount. Chicago only learned the

basis for this reduction several months later during a conversation with the Contracting Officer, in which she asserted that she took the rent reduction because leaks made the Building less than "Class A" and also to cover the "costs" of additional personnel time devoted to the issue.

19. By letter dated April 27, 2007, and after IRS had been in the Premises for almost 3 full years, GSA advised Chicago that the Building continued to leak, that it contained mold that was spreading, and that if Chicago did not resolve all issues by May 11, 2007 (just 14 days later), GSA would terminate the Lease for default.

20. Chicago responded by advising GSA that mold issues had been resolved but despite its repeated efforts to remedy the roof and the HVAC issues (some of which efforts GSA had acknowledged were successful), it appeared that Chicago might have to install a new roof insulation system to prevent future reoccurrences, which likely could not be completed until later in the summer. When Chicago asked GSA how it wanted Chicago to proceed, GSA terminated the Lease on May 18, 2007, just 21 days after issuance of its notice to cure.

21. Despite its complaints, IRS has been able to use and occupy the Premises continuously and, in fact, it is still using and occupying the Premises as of the date hereof.

22. Despite the termination, and because IRS has remained in the Premises, Chicago has continued to be responsive to all complaints and has continued all planned building repairs and modifications to prevent reoccurrences. GSA and IRS are aware of these continued efforts.

23. GSA issued a solicitation for new space for IRS's use on May 4, 2007, before it terminated the Lease at issue herein and has negotiated and entered into a new lease for space to be occupied by the IRS in Chicago under Presolicitation Notice GS-05B-17995 or other procurement vehicle or method.

24. If IRS relocates to new premises, Chicago will be deprived of the benefits of the Lease, most probably will lose the Premises due to foreclosure by lenders, and will be harmed in other ways.

25. The Building was built specially for the GSA/IRS per their overall space and buildout requirements in southern Cook County; therefore, it is not readily marketable to non-Government tenants without major renovations. Moreover, the amount of rent agreed to in the Lease, when combined with the Building's current configuration and the need for new tenant fit out and the high likelihood that Chicago is unlikely to find another full-building tenant, virtually guarantees that Chicago will lose the Building to its lenders before it is able to mitigate, in any meaningful or significant way, its damages. Such an occurrence will cause Chicago to lose all of its equity in the Building, or $1,000,000.00.

26. Chicago will incur damages including, but not limited to, net unpaid rent and other payments due but not made under the Lease, totaling at least $3,000,000.00.

27. This action is timely filed.

**COUNT I**
**Breach of Contract and Failure to Comply With Applicable Regulations**
**<u>Resulting from GSA's Failure to Give Chicago Proper Notice and Opportunity to Cure</u>**

28. Chicago incorporates paragraphs 1 – 27 herein as if fully set forth.

29. FAR 552.270-22, which is incorporated into the Lease, required GSA to give Chicago notice and 30 days to cure any alleged default.

30. GSA gave Chicago a notice to cure on April 27, 2007, which required Chicago to cure within just 14 days, and GSA terminated the Lease for default on May 18, 2007, only 21 days after its notice.

31. GSA's failure to comply with the terms of the Contract by, *inter alia*, failing to give

Chicago the required 30 days to cure was a breach of the Lease by which Chicago was damaged and renders the default termination arbitrary, capricious, and contrary to applicable regulations.

**COUNT II**

**Breach the Contract – Unjustified Termination for Non-Material Default**

32. Chicago incorporates paragraphs 1 – 27 herein as if fully set forth.

33. The primary problems experienced by IRS included (i) condensate on windows resulting from conditions that have now been repaired, (ii) wet ceiling tiles, which Chicago replaced, and (iii) minor ceiling leaks, the majority of which have been remedied and the rest of which Chicago is continuing to repair.

34. Chicago always addressed the problems identified by GSA/IRS and is continuing to work to remedy them. It has already resolved all of the known HVAC issues and has also remedied almost all of the roof issues.

35. The problems experienced by IRS were minor in nature and resulted in minimal disruption to IRS's ability to operate in virtually every area of the Premises on a continuous basis.

36. Any breach of the Lease, which Chicago disputes, that occurred was immaterial. GSA, by its own calculation, was adequately compensated for the small portion of the Premises which it was allegedly unable, for short periods, to use when it took its less than 3% reduction in rent, and its later 10% reduction is unsupported, unjustified, and excessive.

37. GSA's default termination lacked good grounds and solid evidence.

38. GSA's termination of the Lease was unjustified and wrongful because Chicago was not in material breach of the Lease.

39. The wrongful default termination very probably will cause Chicago to lose the Building and be deprived totally of the benefit which it reasonably expected to receive.

40. The wrongful default termination will cause Chicago to suffer a total forfeiture of the Lease.

41. Chicago's efforts to remedy the Building's problems were successful, with only minor exceptions which could have been fully remedied by Chicago if given the opportunity by GSA/IRS. Chicago has continued repair and problem prevention activities efforts when allowed to enter the building during the period since the termination and has been fully responsive to tenant complaints by IRS.

42. Chicago's efforts to remedy the Building's problems comport with standards of good faith and fair dealing.

43. GSA has not borne the burden of proving that the termination was proper.

**COUNT III**
**The CO's Determination to Terminate the Lease for Default Was Arbitrary and Capricious and an Abuse of Discretion**

44. Chicago incorporates paragraphs 1 – 27 herein as if fully set forth.

45. The contracting officer failed to meet her obligation to apply reasonable discretion in determining to terminate the Lease for default.

46. The decision to terminate for default was not honestly rendered.

47. The decision to terminate for default was an abuse of discretion since IRS continuously occupied the Building from the beginning of the term and continues to do so without material problems or interferences in its ability to perform its required tasks.

48. The decision to terminate for default was an abuse of discretion since the Building was and is safe for IRS's use and occupancy.

49. The decision to terminate for default was an abuse of discretion since Chicago successfully completed prior repairs, it promised to complete the additional repairs requested by

IRS, and the repairs which form the basis for the default termination could have been and are being accomplished by Chicago within a reasonable time after the cure notice. Chicago was not given an adequate opportunity to complete the repair and modification work to prevent reoccurrence of the problems.

50. This Court should reverse the termination for default and award all damages to Chicago appropriate for GSA's wrongful lease termination.

WHEREFORE, Chicago prays that the Court sustain the appeal in favor of Chicago and against the United States on Counts I, II and III; reverse the GSA's termination and

a. award Chicago damages in the amount of the unpaid rent that it would have received during the remainder of the term of the Lease;
b. award Chicago utility and maintenance costs and real estate taxes that it would have been compensated for but for the termination, which amount, with lost rents, will be at least $3,000,000.00;
c. award Chicago damages in the amount of the equity loss in the Building of at least $1,000,000.00;
d. award Chicago all allowable costs and expenses, in an amount yet to be determined;
e. award Chicago such other and further relief as this Court deems just and proper.

Respectfully submitted,

Date: 09/20/07

Laurence Schor, D.C.
lschor@msadlaw.com
McManus, Schor, Asmar & Darden, L.L.P.
1155 15th Street, N.W., Ninth Floor
Washington, D.C. 20005
202-296-9260
202-659-3732 fax
Counsel of Record for Chicago Ridge, LLC

Of Counsel:
Susan L. Schor
sschor@msadlaw.com
Dennis C. Ehlers
dehlers@msadlaw.com
McManus, Schor, Asmar & Darden, L.L.P.