# In the United States Court of Federal Claims

Nos. 07-680C and 09-576C

(Filed:  April 27, 2012)
_____

| | |
|---|---|
| 5860 CHICAGO RIDGE, LLC, | * Government contracts; Trial; Lease of office |
| | * building; Termination for default; Nature of |
| Plaintiff, | * government's burden of proof in termination |
| | * for default; Must defendant prove material |
| | * breach?; Repeated leaks at building |
| v. | * impacted defendant's ability to enjoy and |
| | * use building, warranting default; Problems |
| THE UNITED STATES, | * with heating and air conditioning |
| | * inadequately documented; Reprocurement |
| Defendant. | * costs disallowed; Property tax adjustment |
| | * clause; Rent reductions overstated. |
| | * |

_____

## OPINION
_____

*Laurence Schor* and *Susan L. Schor,* Asmar, Schor & McKenna, PPLC, Washington, D.C., for plaintiff.

*Douglas T. Hoffman*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

**ALLEGRA, Judge:**

"A small leak will sink a great ship."[1]

This government contract case is before the court following trial in Washington, D.C.  In this case, 5860 Chicago Ridge, LLC (Chicago Ridge or plaintiff) challenges a termination for default by the General Services Administration (GSA) of a lease of a building built to provide office space to the Internal Revenue Service (IRS).  The lease was for ten years; the IRS left after less than four.  It is undisputed that there were problems with the building in terms of leaks, as well as heating and air conditioning.  The question is whether the degree, nature and repetition of these problems – as well as the inadequacy of plaintiff's response thereto – was such as to

_____

[1]  Benjamin Franklin, The Way to Wealth (1758).

support the termination for default.  The court holds that it was – that is to say, that defendant correctly terminated the lease in question for default.  Nevertheless, defendant owes Chicago Ridge certain damages for deductions in lease payments that were improperly made.

## I.    FINDINGS OF FACT

Chicago Ridge is owned by Drew Ridge, LLC (Drew).  Initially, the building was managed by a subsidiary of Drew, BCD Management, LLC.  Effective May 5, 2005, however, Chicago Ridge hired Chicagoland Commercial (Chicagoland) to manage the property.

### A.    The Lease and the Building

On July 26, 2002, GSA and Chicago Ridge entered into Lease No. GS-05B-17003 (the Lease), for a building to be constructed by Chicago Ridge at 5860 W. 111th St., Chicago, Illinois.  The Lease was for a base term of ten years – from May 1, 2003 through April 30, 2013. The yearly base rent under the Lease was $536,475, payable by GSA at the rate of $44,706.25 per month in arrears.[2]  Additionally, GSA was obligated annually to pay a lump sum equal to the amount by which the real estate taxes owed by Chicago Ridge exceeded those owed in the "base year" of the Lease.[3]

The two-story building (the Building) was built according to GSA's specifications, with 17,250 rentable and 15,750 usable square feet on its first and second floors (assigning the government all of the occupiable space).  The Lease specified a number of the Building's features.  It required, for example, that it have a "brick veneer exterior" and a sloped roof, *i.e.*, "a gable, shed or hip roof with a pitch of 3/12 or greater and with metal standing seam or asphalt shingle roofing."  The Lease authorized GSA to review the owner's initial schematic drawings showing the footprint of the Building, including the proposed location of, *inter alia*, core elevators, stairwells and mechanical rooms.  Subsequently, interior alterations to the space (*i.e.*, the locations of walls and other tenant improvements) had to be made according to GSA's "approved design intent drawings;" Chicago Ridge had 180 days after receiving these drawing to make the necessary changes.  GSA and IRS representatives periodically visited the Building during its construction.  The Building passed all local inspections and Chicago Ridge received an unconditional certificate of occupancy for the Building.  GSA accepted the Building after it was constructed and conducted a walk-through inspection of the Building before the IRS took possession and moved in on or about June 25, 2004.

---

[2]  On August 2, 2004, GSA and Chicago Ridge signed a supplemental lease agreement changing the annual rental rate to $546,307.50 and the monthly payment to $45,525.63.  This agreement was effective June 25, 2004, the day that the IRS first occupied the building.

[3]  Chicago Ridge determined the base year property taxes to be $116,000.  For the years 2006 and 2007, defendant paid the property tax differential over $116,000.

A number of other provisions in the Lease are relevant here.  Section 7.7 of the Lease stated that "[a]ll equipment and systems shall be maintained to provide reliable energy efficient service without unusual interruption, disturbing noises, exposure to fire or safety hazards, uncomfortable drafts, excessive air velocities, or unusual emissions of dirt."  To amplify this point, the Lease incorporated, by reference, a number of FAR clauses.  Among these was FAR § 552.270-6, Maintenance of Building and Premises – Right of Entry (SEP 1999), which states:

> Except in case of damage arising out of the willful act or negligence of a Government employee, Lessor shall maintain the premises, including the building, and all equipment, fixtures, and appurtenances furnished by the Lessor under this lease, in good repair and condition so that they are suitable in appearance and capable of supplying such heat, air conditioning, light, ventilation, access and other things to the premises, without reasonably preventable or recurring disruption, as is required for the Government's access to, occupancy, possession, use and enjoyment of the premises as provided in this lease.  For the purpose of so maintaining the premises, the Lessor may at reasonable times enter the premises with the approval of the authorized Government representative in charge.

48 C.F.R. § 552.270-6.  Another FAR clause incorporated into the Lease was General Clause 15, FAR § 552.270-10, which stated that –

> The covenant to pay rent and the covenant to provide any service, utility, maintenance, or repair required under this lease are interdependent.  In the event of any failure by the Lessor to provide any service, utility, maintenance, repair or replacement required under this lease the Government may, by contract or otherwise, perform the requirement and deduct from any payment or payments under this lease, then or thereafter due, the resulting cost to the Government, including all administrative costs. . . .  Alternatively, the Government may deduct from any payment under this lease, then or thereafter due, an amount which reflects the reduced value of the contract requirement not performed.  No deduction from rent pursuant to this clause shall constitute a default by the Government under this lease.  These remedies are not exclusive and are in addition to any other remedies which may be available under this lease or at law.

48 C.F.R. § 552.270-10.

The Lease also included the standard disputes clause found at FAR § 52.233-1.  In addition, it incorporated various remedy clauses.  One of these, GSAR 552.270-25 (Jun 1994), stated:

> (a) If the Government fails to occupy any portion of the leased premises or vacates the premises in whole or in part prior to expiration of the term of the lease, the rental rate will be reduced.

- 3 -

(b) The rate will be reduced by that portion of the costs per BOMA Office usable square foot of operating expenses not required to maintain the space. Said reduction must occur after the Government gives 30 calendar days prior notice to the Lessor, and must continue in effect until the Government occupies the premises or the lease expires or is terminated.

Another potential remedy was provided by General Clause 16, the termination for default clause found in FAR § 552.270-22, Default by Lessor During the Term (SEP 1999), which provided:

(a) Each of the following shall constitute a default by Lessor under this lease:

(1) Failure to maintain, repair, operate or service the premises as and when specified in this lease, or failure to perform any other requirement of this lease as and when required provided any such failure shall remain uncured for a period of thirty (30) days next following Lessor's receipt of notice thereof from the Contracting Officer or an authorized representative.

(2) Repeated and unexcused failure by Lessor to comply with one or more requirements of this lease shall constitute a default notwithstanding that one or all such failures shall have been timely cured pursuant to this clause.

(b) If a default occurs, the Government may, by notice to Lessor, terminate this lease for default and if so terminated, the Government shall be entitled to the damages specified in the Default in Delivery-Time Extensions clause.

48 C.F.R. § 552.270-22.  The Lease did not contain a termination for convenience clause.

## B.    Leaks

The parties agree that the FAR clauses incorporated in the Lease required Chicago Ridge to maintain the Building's roof in good repair and condition.  In addition, section 4.7 of the Lease indicated that "[a]ll the windows shall be weather tight."

Yet, as reflected in a GSA inspection report, the IRS began experiencing problems with leaks in the Building beginning no later than November 19, 2004 – barely five months after it began its occupancy.  The leaks tended to arise in certain parts of the Building, primarily on the second floor.  The following chart summarizes the record evidence concerning the areas of the Building that were affected, the times when the leaks occurred, and the severity of the leaks encountered:

| Date | Unit(s) | Severity |
|---|---|---|
| **2004** | | |
| 11/19 | #214 | water |
| **2005** | | |
| 1/6 | NW Hall & 5 unidentified | water |
| 1/23-25 | Break Room & NE Hall | wet ceiling tiles, carpet soaked |
| 9/23 | Break Room | stained ceiling tiles |
| 10/5 | Break Room | stained ceiling tiles |
| **2006** | | |
| 1/13 | #02-043 | wet ceiling tiles |
| 1/23 | #214 | water |
| 3/10 | #214 | water |
| 3/17 | Break Room | stained ceiling tiles |
| 4/25 | #207 | water |
| 5/16 | #214 | water |
| 5/30 | #214 | water on the window sill |
| 6/12 | #214 | water |
| 6/16 | #02-054 | water, desk damp |
| | #205 & NE Hall | stained ceiling tiles |
| 7/20 | #214 | stained ceiling tiles |
| 7/27 | # 214 & NW Hall | water |
| 8/11 | #s 205, 207, 02-054 & NE Hall | wet ceiling tiles |
| 8/16 | #205 | stained ceiling tiles |
| 8/24 | #s 214 & 02-054 | water |
| 8/25 | #02-054 | wet ceiling tiles |
| 9/11 | #s 205, 214 & NE Hall | water |
| 9/13 | # 214 & NE Hall | water |
| | #205 | stained ceiling tiles |
| 10/2 | #207 & NE Hall | water |
| 12/4 | Break Room & #214 | water |
| 12/14 | NE Hall | wet ceiling tiles |
| 12/21 | Near #02-056 & 1 unidentified | water & stained ceiling tiles |
| **2007** | | |
| 1/10 | Unidentified | stained ceiling tiles |
| 1/26 | Unidentified | stained ceiling tiles |
| 2/20 | Break Room | wet ceiling tiles, carpet soaked |
| | NW Hall & 1 unidentified | wet/stained ceiling tiles |
| 2/26 | #207 & NW Hall | wet ceiling tiles, carpet soaked |
| | NW Hall | stained ceiling tiles |
| 3/1 | #205 | wet ceiling tiles |
| | Unidentified | water |
| 4/4 | NW Hall | stained ceiling tiles |
| 4/11 | #214 | water |
| | NE Hall | wet ceiling tiles |
| | NW Hall | stained ceiling tiles |
| 4/25 | #02-056 | wet ceiling tiles, carpet soaked |
| | #s 02-057, 02-058 & 2 unidentified | water |
| 4/30 | Break Room | stained ceiling tiles |
| 5/7 | #207 | stained ceiling tiles |
| 5/15 | Unidentified | stained ceiling tiles |
| 7/10 | #02-058 | water |
| 8/14 | NE Hall | stained ceiling tiles |
| 8/20-24 | #214 | water |
| | NE Hall & 1 unidentified | wet/stained ceiling tiles |
| 10/18 | #214 | water |
| 12/3 | NE Hall | wet ceiling tiles |

Several observations about this chart are in order:  The chart reflects seventy-five instances of some form of leakage – thirty-seven of which involve some degree of water dripping into occupied space, with the rest involving wet or stained ceiling tiles.  Setting aside complaints in which the specific areas leaking were not identified, it appears that in the three years and eight months that the IRS occupied the Building, leaks, in varying degrees, occurred in at least eight units, the break room and two halls.  Three common areas – the northwest and northeast halls, as well as the break room – account for one-third of the complaints (25 of 75), while one of those offices (#214) alone accounts for twenty percent of the complaints (15 of 75).

A variety of other facts about the leaks can be distilled from the record and are relevant here.  While at no point did major portions of the roof ever fail, some of the leaks encountered were significant.  A color-coded map, found in the appendix to this opinion, shows the areas of the second floor that were affected by the leaks, as well as the nature and frequency of the leaks encountered.  That map reveals that, over the IRS's period of occupancy, nearly half of the offices on the perimeter of the second floor experienced some form of leakage, with the offices of IRS managers (which, not surprisingly, had windows) disproportionately affected.  The most significant of these leaks occurred in the northeast quadrant of the Building, directly underneath the heating, ventilation and air conditioning (HVAC) unit on the roof (also known as the Roof Top Unit or RTU).  These leaks affected not only individual offices,[4] but common areas used by multiple employees, such as hallways and the only break room located on the second floor – and at times resulted in damage to carpeting and other office furniture and equipment.[5]

---

[4]  The most severely impacted office was that of Supervisory Revenue Agent Clinnett Prophet.  She testified that so much water leaked through her window that, on several occasions, she had to cover her computer with plastic and move her printer and telephone to protect them.  She testified that "for the most part it always leaked when it was raining," and the record includes multiple references to leaks in her office from November 2004 through October 2007.  The "continuing dampness" in her office led to the only existence of mold in the building, found under the wallpaper along Ms. Prophet's window sill.  The existence of this mold was documented in a March 5, 2007, study conducted by GSA's Fire Protection and Safety Branch.  Ms. Prophet noted that although the leak in her office was never completely fixed, the affected ceiling tiles, wallpaper, and window sill in her office were replaced by plaintiff in a timely manner.  Ms. Prophet admitted she could have moved to a different office, but she indicated – and emails between IRS and GSA personnel confirm – that she liked her office and did not want to move.

[5]  The first set of particularly serious leaks occurred in January 2005.  On January 6, 2005, the IRS's administrative officer reported "6 new leaks" in the northwest and southwest corners of the building.  By January 24, 2005, the ceiling tiles in the northeast corner had become soaked with water; one fell down in the employee break room.  The floor of that room had standing water on it, and the carpet was wet in two other places.  In an email to IRS employees working on the second floor of the Building, the IRS administrative officer warned that they should avoid this area because the wet ceiling tiles appeared "about to collapse."  In a January 25, 2005, email, this same individual sought assistance from Chicago Ridge, reporting that "it is leaking in 3 new places . . . . I am running out of trash cans to put under the leaks."  Two days

At least initially, the leaks did not correlate with any obvious weather patterns, *i.e.*, they did not occur only when it rained or snowed.  Eventually, Chicago Ridge postulated that some of the leaks were not the result of water infiltrating from the roof, but rather occurred when condensation formed on the underside of the roof over some of the untempered suspended ceiling areas and the water then dripped down.  Occurrences of the latter phenomenon were believed to be more dependent upon the ambient outside temperature than on the presence of natural precipitation.

Each round of leaks was followed by attempts by Chicago Ridge to remedy the problems.[6]  Initially, Chicagoland relied upon the roofing company provided under the building constructor's warranty to fix the problems.  But, when the leaks continued, in May of 2006, Chicagoland hired Volpe Roofing (Volpe) to inspect the roof and make necessary repairs.  Volpe, in fact, made a number of minor repairs.[7]  Roof Inspection Services (RIS) and Volpe

---

later, on January 27, 2005, GSA's contracting officer sent plaintiff a letter recounting these events and asking plaintiff to submit a plan to repair the roof permanently "so that leaks of this nature do not occur again."

The Building suffered another series of especially severe leaks in February of 2007.  As described by a Drew official in his testimony, on this occasion, "[t]here was a significant amount of water on the floor of 12-foot diameter or so on the carpet which was saturated.  There were multiple other stains that I had not seen on ceiling tiles occur in the past."  Contemporaneous documentation from a Chicagoland employee reflected that on this occasion, "there were a number of ceiling tiles down, bulging, and stained throughout the top floor," as well as water stains on the walls, rendering "four work stations . . . unusable."  Pictures in the record further document this damage.

[6]  GSA policy required five days' notice before plaintiff could gain building access to perform repairs, except in "emergencies."  What constituted an "emergency" was, and is still, disputed by the parties.  On brief, plaintiff claims that "[o]n several occasions," it or its contractors were denied access to the Building to make urgently-requested repairs.  Tony Lombardo, plaintiff's operation's manager for the Building, testified that this created additional expenses and impeded plaintiff's "ability to solve the problems in a timely and effective manner."  However, Mr. Lombardo also testified that he personally visited the Building "hundreds and hundreds of times" but was only denied access on a handful of occasions.  Moreover, plaintiff's requests for access raised legitimate security concerns due to the sensitive nature of the materials kept and work performed at the IRS Building.  Various messages in the record also suggest that, on occasion, IRS officials made plans to escort plaintiff's contractors, only to find that the latter did not arrive at the appointed hour.  On the whole, it is unclear what "appropriate" access to this building would entail and who was at fault for situations in which access was denied.

[7]  A June 7, 2006, letter from Michael S. Volpe to Chicagoland indicated that, following an inspection conducted on June 1, 2006, Volpe –

completed a similar inspection in late August of that same year.  On September 8, 2006, RIS reported to Chicagoland that "[t]he roof repairs are acceptably completed and should stop the current leaks."  Yet, the leaks continued.  During this period, Chicago Ridge called in a structural engineer, Joseph L. Farruggia, from the firm GFGR, Inc., to review the roof design.  Mr. Farruggia authored a report, dated September 20, 2006, in which he analyzed the roof design and catalogued the efforts made by RIS and Volpe to address the problems discovered.[8]  Late in November, 2006, a contractor lifted the roof-top HVAC system off of its existing base and

---

> [a]pplied commercial Grade Terpolymer Sealant to the sides and the bottoms of the S.W. scupper box to prevent possible rain driven leakage. . . . Sealed all open seams of metal front wall copings.  Made necessary field roof and flashing repairs to leak area.  Made necessary repairs to shingle roof area.  Installed missing shingles as needed and repaired all raised nail heads and resealed the shingles.  Resealed and filled all H.V.A.C. pitch pans.  Cleaned all debris from roof area.  Checked and resecured and [sic] loose gutter straps as necessary.  Resealed around H.V.A.C. gas pipe line.

The letter indicates that following these repairs, Volpe conducted water tests and could not recreate the leaks.

[8]  Mr. Farruggia's report addressed various aspects of the Building.  Regarding the Building's roofing, his report stated –

> This element of the construction has failed to function properly.  Two conditions of roof leaks, which are likely separate issues, are presently occurring.  One, leaking has been occurring at the second floor ceiling over general office cubicles at the northeast corner of the building, as well as leaking in the ceiling of this general northeast corner location at offices along the east wall.  This area is directly below the Roof Top Unit and attention was focused on the RTU installation and duct penetrations as possible causes of the leakage.  Two, there is leaking above the windows of an office at the south wall just to the east of the scupper box and down spout at the south wall.  Here attention was focused on the construction of the metal scupper box and the through wall flashing as the possible cause of the leakage.  These conditions were reviewed and observed separate by this professional, a roofing consultant, RIS Consultants and roofing company, Volpe Roofing, in late August.  Several repairs were made by Volpe Roofing in and around the south wall scupper in the first weeks of September.

> This professional, RIS and Volpe were on site on September 19, 2006, to perform a flood test at the location of the RTU.  The test indicated that water was penetrating into the RTU at the gas supply line and around the attachment of the unit to the structural steel frame.  Volpe performed sealant repairs at the RTU directed by RIS and myself.  After the flood test and repairs at the RTU, I reviewed the south wall scupper box with Volpe Roofing.  The repairs to the flashing at the box itself appeared sound and working.

mounted it on a new custom base that allowed the condensation to drain better. Despite these efforts, the leakage persisted.

In early December of 2006, Chicago Ridge hired a contractor which replaced the curb around the roof-top HVAC unit. In February of 2007, Chicago Ridge concluded that the other leaks had masked a faulty architectural design that had given rise to the condensation problem discussed above.[9] On March 5, 2007, Chicago Ridge engaged two new firms – Arcotech Corporation (Arcotech) and Wiss Janney Elstner (WJE) – to further analyze the roof problems. On March 23, 2007, an inspection of the insulation under and around the RTU revealed that it was soaked with water – touching the insulation immediately resulted in water leaking through the ceiling below. On March 28, 2007, Arcotech and yet another consulting company, Applied Energy Services Corporation (AESC), issued a joint report that described, in detail, the condensation problem referenced above. On April 17, 2007, Chicagoland received a report from RIS detailing a nine-step plan for addressing the leaks, suggesting that repairs should cost no more than $1,500. Those repairs were apparently made. Yet, the leaks continued. On April 30, 2007, Chicago Ridge received a report from WJE, extensively analyzing the leakage problems and confirming the condensation problem. To deal with this condensation problem, Chicago Ridge hired a contractor that, in August of 2007, installed insulation in the attic space to prevent moisture from the air-conditioned space from freezing on the metal deck of the roof. The installation of this insulation generated an odor that caused the Building to be closed to employees on August 6, 2007. Later, additional insulation was added to the RTU and some of the Building's duct work.

The Building was never closed entirely because of leaks. Many, but not all, of the leaks appeared to stop in the latter part of August of 2007, approximately five months before the IRS permanently vacated the Building. However, the problems involving Ms. Prophet's office were unrelated to the other problems experienced with the roof and related to a grout issue in the expansion joint above a window. This problem was not diagnosed and solved until after the Building was vacated in 2008. Although it repeatedly threatened to do so, GSA never invoked

---

[9] Daniel Drew, one of the owners of Drew Management, described this problem at trial in the following terms:

> This building was designed with a large unheated attic. The roof structure was a metal deck on steel trusses. It was passively vented. That is to say that there were no fans to move air in and out of the attic space.

> The insulation was at the ceiling level, and there was no effective vapor barrier so that moisture from the condition space went up into the unheated insufficiently ventilated attic, froze on the metal deck of the roof, and then would leak, and would melt, and would condense, and drip primarily down the deck until it ran into the structural steel supporting the rooftop unit, or into the duct work itself coming down from the rooftop unit.

the portions of the Lease that would have allowed them to take over the leak repair work themselves.[10]

## C.     HVAC Issues

Section 6.7(a) of the Lease stated that "[t]emperatures shall conform to local commercial equivalent temperature levels and operating practices in order to maximize tenant satisfaction," adding that "[t]hese temperatures must be maintained throughout the leased premises and service areas, regardless of outside temperatures, during the hours of operation specified in the lease." The CO considered the Building Owners and Managers Association (BOMA) standards, specifically American Society of Heating, Refrigeration and Air Conditioning Engineers (ASHRAE) Standard 55, to be the commercial equivalent temperature levels and operating practices applicable to the Building.  The ASHRAE temperature range is 68 to 74 degrees in winter and 73 to 79 degrees in summer.[11]  These ranges are set at levels intended to be comfortable for eighty percent of the people in a building.  Section 6.7 of the Lease required that, during non-working hours, the heating system was to be set back to 55 degrees (the record suggests that this night-time temperature was increased to 65 degrees in December of 2004).   In terms of HVAC operations, the Lease further provided that "[s]imultaneous heating and cooling are not permitted" – which meant that the system used could not cool the air down and then heat it back again as a means to control temperature.

From November 29, 2004 to August 2, 2007, there were 71 temperature-related employee complaint (ERC) tickets – some complaining that temperatures were too hot; others that they were too cold.  The following chart summarizes these complaints:

| # Complaints | Employee | Location | Date(s) of Complaint | Complaint |
|---|---|---|---|---|
| 1 | Brenda Euell | 1st floor | 10/18/05 | Cold |
| 8 | Phyllis Harris | 2nd floor | 10/26/05; 10/27/05; 2/2/06; 4/25/06; 12/18/06; 2/21/07; 3/22/07; 6/7/07 | Cold (7) Hot (1) |
| 1 | C. Thomas | 2nd floor | 10/26/05 | Cold |
| 1 | Karen Carpenter | 2nd floor | 10/26/05 | Cold |
| 1 | Crystal Ferguson | 2nd floor | 10/26/05 | Cold |
| 6 | C. Glasco-Cooks | 2nd floor | 10/26/05; 2/2/06; 3/13/06; 4/23/07; 5/24/07; 6/7/07 | Cold (3) Hot (3) |
| 2 | S. Butler-Cowan | 2nd floor | 10/27/05; 11/16/05 | Cold |
| 1 | Mimi Orr-Tubbs | 2nd floor | 10/27/05 | Cold |

[10]  The record suggests that Chicago Ridge may have initially dissuaded GSA from taking over the repairs, fearful that activity by any contractor other than the warranty contractor  would void the roof warranty.  This was no longer an issue after May of 2006, when Chicago Ridge itself hired a non-warranty contractor in an attempt to address the leakage problem.

[11]  Several emails from an IRS administrative officer suggest that he mistakenly believed that the agreed winter temperature was 72 degrees.

| 11 | L. Meriwether | 1st floor | 10.27.05; 10/28/05; 11/16/05; 6/14/06; 7/7/06; 2/5/07; 2/6/07; 2/9/07; 4/19/07; 4/25/07; 4/27/07 | Cold (10) Hot (1) |
| 2 | Jean Brown | 1st floor | 10/28/05; 11/16/05 | Cold |
| 1 | Mary Farrell | 2nd floor | 11/16/05 | Cold |
| 1 | Larry Morris | 2nd floor | 11/16/05 | Cold |
| 2 | Allison Warlyn | 1st floor | 11/16/05; 6/30/06 | Cold |
| 3 | Karen Coleman | 1st floor | 12/15/05; 11/16/06; 3/29/07 | Cold |
| 2 | Rhonda Taylor | 1st floor | 6/15/06; 4/25/07; 5/9/07; 8/1/07 | Cold (1) Hot (3) |
| 1 | G. Robinson | 2nd floor | 8/29/06 | Cold |
| 2 | Patricia White | 1st floor | 10/3/06; 5/24/07 | Cold (1) Hot (1) |
| 4 | Kelly Gibson | 1st floor | 10/26/06; 10/31/06; 11/13/06; 11/15/06 | Cold |
| 1 | Rachael Glass | 2nd floor | 2/1/07 | Cold |
| 1 | Keith Hartley | 2nd floor | 2/16/07 | Hot |
| 1 | Brian Klecka | 2nd floor | 4/6/07 | Hot |
| 4 | Reginald Haney | 2nd floor | 4/18/07; 4/24/07; 5/24/07; 6/7/07 | Hot |
| 6 | Rehman Shami | 1st floor | 5/9/07; 5/22/07; 5/24/07; 5/30/07; 6/1/07; 6/7/07 | Hot |
| 3 | Irene Kazenas | 1st floor | 5/23/07; 5/30/07; 8/1/07 | Hot |
| 1 | Joseph Petrizzo | 2nd floor | 5/29/07 | Hot |
| 1 | V. Miramontes | 2nd floor | 6/21/07 | Cold |
| 1 | Donna Freeman | 2nd floor | 8/2/07 | Cold |

Only about a third of these complaints – twenty-five, to be precise – listed specific temperatures that were outside the ASHRAE range discussed above.  It is unclear how these temperatures were measured.  Some may have been estimates.  Other readings may have come from a variety of sources, including:  (i) thermometers provided by the IRS; (ii) control boxes attached to the HVAC central unit; or (iii) thermometers brought from home by the IRS employees.  GSA records reflect that all of these tickets were closed, meaning that at some point the complaints were deemed resolved.  Still other temperature-related complaints (not reflected in the chart above) were made by the IRS employees and their managers using emails and other communications that did not cause a formal ticket to be opened.

A few of these complaints plainly were *bona fide*.  For example, the Building was closed on November 26 and November 29, 2004, because temperatures were too low; at least some IRS employees also left the Building on December 28, 2004, for the same reason.  On other days, such as January 14, 2005, there were multiple complaints indicating that temperatures were far below the ASHRAE range.  To deal with the low temperatures in the Building during such days, Chicagoland officials instructed their maintenance crews to set up space heaters.  On January 25, 2005, the local chapter of the National Treasury Employees Union filed a grievance relating to the temperature in the Building.  Nevertheless, it appears that other tickets and complaints may have overstated the conditions being encountered, *i.e.*, that a given complaint reflected the temperature tastes of the individuals involved and did not necessarily reflect a temperature outside the ASHRAE range discussed above.  Moreover, as the chart above reveals, three

employees accounted for more than third of all the tickets filed; just six accounted for more than half the tickets filed.[12]

Throughout the period in question, GSA inexplicably failed to conduct systematic tests to confirm how many of these complaints were *bona fide* or otherwise to document the fluctuations of temperature inside the Building – even though GSA had the technology (*e.g.*, temperature/ humidity data loggers) to conduct such studies.  According to defendant's HVAC expert, given the volume of complaints received, GSA's failure to perform a temperature study did not accord with industry practice.[13]  Inspections conducted on several occasions by Chicagoland or its contractors (*e.g.*, on July 11, 2006), disproved certain complaints, revealing that temperatures that were drawing complaints were actually in the acceptable range.  In addition, Chicagoland personnel could remotely access, via the Internet, a computer system that monitored the real-time air temperatures at each thermostat throughout the Building.  On at least several occasions, the readings from this system appeared to contradict complaints that were being made by IRS employees.

---

[12]  On occasion, internal IRS emails cast doubt on the accuracy of these frequent complaints.  Such was the case with respect to the employee who filed the most tickets, Phyllis Harris.  When asked in an email about a ticket that she filed on February 16, 2005, an IRS administrative officer responded – "it may be cooler but it is not cold," adding that "I believe we should take her complaint with a 'grain of salt.'"  Another e-mail from an IRS employee casts doubt on a temperature complaint that was received on June 14, 2006, indicating that he was at the building at around the time of the complaint and "the temperature seemed all right to me."

[13]  In this regard, the following exchange occurred between Kenneth McLauchlan, defendant's HVAC expert, and the court:

Q:      . . .  If when GSA has a problem in this building and with temperature, they bring in one of these very fancy devices to determine ranges of temperature over extended periods of time, [w]hy in a building like this that appears to have severe problems would they not take a similar type of step?

A:      That would be my question also.

Q:      All right, so would industry practice be that if you have this level of complaints, you ought to be doing some temperature study?

A:      Yes.

Q:      Okay.  Using that more type of sophisticated equipment?

A:      Yes.

As with the leaks, Chicago Ridge responded to these HVAC complaints by hiring a series of contractors and consultants.[14]  The repairs performed by these firms included remounting the RTU; installing insulation and temperature monitors; and modifying the Building's ventilation. Although it repeatedly threatened to do so, GSA never invoked clauses in the Lease that would have allowed it to take over the repair work itself.  Conversely, at various points during this period, GSA indicated that it was satisfied with Chicago Ridge's response to the HVAC issues.[15] The number of complaints about the HVAC system dropped beginning in December of 2005, after Chicago Ridge purchased and installed, in two waves, thirteen perimeter in-line duct heaters – basically, electric radiant heaters in the duct work that are controlled by a thermostat.[16] GSA approved the installation of these heaters even though technically their installation had the potential of violating the Lease clause that precluded the HVAC system from simultaneously heating and cooling air.

### D.      Actions Leading up to Default

On June 6, 2006, GSA sent Chicago Ridge a cure letter regarding the water leakage and HVAC issues at the Building.  In a letter dated August 16, 2006, the GSA contracting officer (the CO) summarized the problems with leakage and HVAC, asserting that "[t]his building is not in compliance with the lease."  She indicated that if the leak problems were not remedied by

---

[14]  In November of 2005, Chicagoland terminated the service agreement with Gallagher Mechanical, Inc., the original HVAC design and installation company, and retained Dakona HVAC & Engineering to perform a complete inspection and survey of the HVAC system.  In September of 2006, Drew informed GSA that it had retained yet another HVAC contractor, Westside Mechanical.

[15]  For example, in a letter sent to Chicago Ridge on February 8, 2005, the GSA contracting officer indicated that –

Your progress on the HVAC system from January 26th, 2005 to February 2, 2005 is considered acceptable.  GSA still does not consider the HVAC system to be functioning properly; however, we feel that you have taken satisfactory steps in your attempts to correct the deficiencies during the aforementioned time.

[16]  Various emails from Drew and Chicagoland officials admitted that the original design of the HVAC system was defective.  For example, on December 14, 2005, one Drew official wrote Mr. Lombardo, Chicagoland's manager, indicating that "there could not have been a worse system installed for the design of that building."  In this message, the Drew official added "[n]ot only is the system not intended for a multi-story building, but it wasn't a complete system (it needed the [duct heaters] from the beginning)."  It is less clear who is at fault for the defective design.  The RTU used a variable volume and temperature (VVT) system to vary the warmth and flow rate of forced air to maintain comfortable building temperatures.  Although defendant accepted the plans for the RTU and the HVAC system prior to occupying the Building, both parties acknowledged that the original system left the core of the Building very warm and the outer edges very cold.

August 23, 2006, GSA would begin reducing the rent payments.  On August 18, 2006, Chicagoland responded to this letter indicating that it was awaiting a report from RIS and would address "the findings of the report in a timely manner."  In an email dated August 24, 2006, GSA, responding to a leakage event reported by the IRS that day,[17] notified Chicago Ridge that, pursuant to FAR § 552.270-10, it was reducing the rent by $128.48 per month, plus administrative costs.  In a letter sent the same day, the CO indicated that in light of past leakage problems at the Building, "[i]f GSA receives another indication of continuing or additional water leakage, GSA will reduce your rental payments the day following the complaint."  On August 24, 2006, Chicagoland sent the GSA CO a letter contesting the rent reduction.  By letter dated September 18, 2006, GSA notified Chicago Ridge that it was increasing the rent reduction, to now include a total of 515 square feet and $1,378.48 per month, plus "IRS's and GSA's administrative costs."[18]  This reduction, which, taken with the prior deduction, totaled $4,711.00, was taken every month from August 2006 until the IRS vacated the Building in February 2008, even though the employees affected had not left their work stations, but were instead merely inconvenienced.[19]

Prompted by still more leaks that arose in the early part of October, GSA sent Chicago Ridge a letter on October 6, 2006, demanding that it "show cause why the Government should not default the contract" in the form of a "plan of corrective action."[20]  On October 9, 2006, Mr.

---

[17]  The record indicates that GSA responded to a report that ceiling tiles had fallen because of leakage.  An email dated August 24, 2006, from the Chicagoland property manager contests this claim, indicating that his inspection of the area involved indicated that the tile in question was dry, revealed no water stains, and had simply been moved aside by an IRS employee.

[18]  To calculate this rent reduction, GSA multiplied the rental cost per square foot ($32.12) by the size of the work station(s) vacated, for a total of $1,378.  It then added $3,332.52 in administrative costs, each month.  The 515 square feet that GSA claimed was affected by the leaks constituted approximately three percent of the building's total rentable space, whereas the $4,711 monthly rent reduction equaled approximately ten percent of the monthly rent.  At trial, the CO at first left the impression that she had calculated the administrative costs by summing specific expenses.  Under cross-examination, it quickly became apparent that she had not.  Moreover, during this cross-examination, the CO admitted that, while the contract authorized GSA to charge administrative costs if it took over a repair, it did not authorize GSA to charge these costs in the case of a rent reduction.

[19]  In one instance, the reduction was taken long after the employee originally affected by the leak was moved by the IRS to another building and his office was left vacant.  When asked about this at trial, the contracting officer admitted that while the employee in question left the building in 2006, she had charged the reduction until the IRS left the building in February of 2008.

[20]  A series of government emails dated September 14, 2006, indicate that, by at least that date, IRS officials wanted GSA to terminate the Lease for default and relocate the IRS personnel

Drew responded to this notice, acknowledging that "we have fixed some problems, but obviously not all of them."  In this message, he continued "I only want this nightmare to be over as much as the tenant does . . ."  It appears that, around this time, Mr. Drew realized that the problems with the roof were more substantial than first thought and began planning for the project that repaired the waterproofing at the base of the RTU (which was completed on November 24, 2006).  On December 22, 2006, GSA sent Chicago Ridge another letter, indicating that, despite the recently-completed repairs, the facility was continuing to experience leaks "in the general vicinity of past leaks."  The letter requested that Chicago Ridge submit an action plan for dealing with the leaks and HVAC system by December 28, 2006.[21]

As reflected in the chart above, the leaks continued through the winter of 2007, with various emails documenting exchanges between Chicago Ridge and GSA regarding these events. One of those exchanges occurred on February 20, 2007, when IRS, GSA and Chicagoland representatives walking through the Building witnessed water-soaked carpeting, water stains on the walls, and wallpaper peeling from the walls.  On April 5, 2007, Chicago Ridge provided GSA with the "short term plan" that GSA had previously requested.  On April 27, 2007, GSA sent Chicago Ridge a letter "regarding the continuing water leakage issues at the IRS Leased facility located in Chicago Ridge, Illinois."  This letter summarized the leakage problems from the inception of the Lease through April of 2007.  The letter stated that this was the "FINAL warning before you will be declared in default of the lease" and then quoted the default termination clause in the Lease.  (Emphasis in original.)  The letter stated that "[a]t this point, the only remedy to resolve this prolonged issue   . . . is the complete remediation of the water leakage that MUST be resolved by May 11, 2007."[22]  Chicago Ridge responded to the notice that

---

to new space.  Additional government emails in November of 2006 document further discussion regarding a default, including moving IRS personnel to temporary space.

[21]  This letter stated –

At this point, whether the leakage is due to roof or HVAC problems is irrelevant. Our customer has endured too many interrupted disturbances, some of which have caused our customer to close their doors, and send employees home, making it impossible for them to fulfill their mission.  These office closures costs our customers hundreds, if not thousand of dollars for each and every occurrence, not to mention the safety and welfare of people being at risk.  It is imperative that this matter be permanently addressed immediately.

[22]  In this letter, GSA made several inaccurate assertions, including that, by April 21, 2007, mold had spread to the first and second floors of the facility.  This claim is contradicted by a report, dated April 11, 2007, from an industrial hygienist employed by the IRS, which concluded that "[n]o significant sources of mold growth were found inside the building" and added "[t]he facility is useable at this time, without health concerns, and the air sampling results should confirm this."  (A second mold contamination report issued by the Federal Occupational Health Service on May 9, 2007, confirmed this finding).  The April 21 letter also left the false

same day, indicating, via email, that it would be impossible for it to comply with the May 11th deadline because major work needed to be completed on the roof; this email indicated that "the proper course of action will require an entire new roof SYSTEM," a process that could not be completed "until the end of summer."

On May 4, 2007, GSA issued a pre-solicitation notice for a new space.[23]  On May 18, 2007, GSA terminated the Lease for default, citing Chicago Ridge's failure to remediate the water leakage problems by the May 11th deadline.  (The letter did not reference problems with the HVAC system or any mold issues).  At trial, the CO admitted that the timing of this default "was an error on [her] part," as it technically violated the provision in the Lease which gave Chicago Ridge thirty days from its receipt of the default notice in which to cure the identified deficiencies.  GSA instead gave Chicago Ridge less than fourteen days in which to accomplish its cure.  Following this notification, Chicago Ridge continued to effectuate repairs to the roof, as well as the remainder of the Building.  GSA agreed to allow these repairs to proceed, including the spraying of roof insulation discussed above which occurred in August of 2007.

On August 30, 2007, GSA entered into a lease for reprocurement premises – the Orland Square Professional Center, built in 2007, and located in Orland Park, Illinois.  The IRS remained in the Building through January 2008 – nine months after the Lease was terminated and sixteen months after the IRS made the decision to leave the Building.[24]  On February 28,

---

impression that the Building had been repeatedly and recently shut down for leaks; in fact, the Building had never been shut for leaks, but only for heating issues.

[23]  This notice was issued pursuant to GSA emergency leasing guidance, which indicated that leasing actions to provide work space could be done on an expedited basis to respond to "[e]mergencies of a health/safety or other (HSO) nature which so adversely impact the mission of an agency in a Government-owned or leased building as to necessitate the agency's expeditious location therefrom."  The notice provided that the government was "seeking to lease approximately 17,250 rentable square feet yielding 15,000 usable square feet of contiguous office and related space in Chicago, Illinois & SW Suburbs."  It further indicated that the space was to be "Class A space" located in a "prime commercial office district with attractive, prestigious surrounds with a prevalence of modern design, tasteful rehabilitation in modern use or new construction."

[24]  Asked about this at trial, the GSA contracting officer answered as follows –

Q.    So what we are talking about is a period of time from your default of May 2007 until February, and so that is almost nine months that the IRS remained in the building, although these so-called emergency conditions existed, correct?

A.    Yes.

2008, a GSA representative sent Chicago Ridge a letter summarizing the results of a close-out space inspection. This letter did not request that plaintiff return any property left by the IRS at the Building. Chicago Ridge sold the Building to the Elevator Constructor's Union in June of 2009.[25]

### E.    This Proceeding

On September 20, 2007, plaintiff filed a complaint in this court with three counts: (i) breach of contract and failure to comply with applicable regulations resulting from GSA's failure to give Chicago Ridge proper notice and opportunity to cure; (ii) unjustified termination for a non-material default; and (iii) the arbitrary and capricious termination of the Lease for default by the CO. In its answer, filed December 19, 2007, defendant pled constructive eviction as an affirmative defense. On September 2, 2009, plaintiff filed a second suit seeking to recover on a claim of $2,855,146 that had been denied by the CO; on September 25, 2009, the court consolidated that suit with this case. After discovery closed in this case, on December 22, 2010, defendant filed its second amended answer, in which it asserted two compulsory counterclaims. First, defendant sought the $734,919.63 demanded by the CO on February 22, 2010, as the government's reprocurement costs for this Lease. That sum reflects the difference in rent between the Chicago Ridge lease and the subsequent Orland Park lease, as well as the administrative costs of the reprocurement. Second, defendant sought $88,827.22 for GSA's alleged overpayment of real estate taxes and payment of unused tenant improvements.

Trial in this case was held in Washington, D.C. from April 5-7, 2011, with closing arguments delivered after post-trial briefing on October 6, 2011. Subsequent to these arguments, the parties each filed color-coded diagrams showing the alleged leaks at the Building during plaintiff's occupancy. Those charts have been revised and combined to create the chart found in the appendix.

## II.    DISCUSSION

Default termination is a "drastic sanction." *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969) (citing *Schlesinger v. United States*, 390 F.2d 702, 709 (Ct. Cl. 1968)). It is "a species of forfeiture" – "a remedy to which the Government should not lightly resort." *Decker & Co. v. West*, 76 F.3d 1573, 1580 (Fed. Cir. 1996); *see also DeVito v. United*

---

Q.    And they continued to do their work while they were in the building did they not?

A.    Yes.

[25] After this sale, the new owner placed an entirely new roof on the building. At trial, the owner of Drew indicated that, after this action, he had spoken to the new owner's roofing contractor, who told him that a previously unidentified problem – a ridge vent in the original design that had not been properly sealed – had precipitated this replacement.

*States*, 413 F.2d 1147, 1153 (Ct. Cl. 1969) ("default terminations – as a species of forfeiture – are strictly construed"); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 600 (2000). "[T]he proper interpretation of the default provision," nevertheless, "should strike a balance between the judicial aversion to default terminations and the fact that 'the Government, just as any other party, is entitled to receive that for which it contracted." *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1015 (Fed. Cir. 2003) (quoting *Cascade Pac. Int'l v. United States*, 773 F.2d 287, 291 (Fed. Cir. 1985)).

When a contractor challenges a default termination, the government bears the burden of establishing the validity of the termination. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987); *see also Aptus Co. v. United States*, 61 Fed. Cl. 638, 646 (2004) ("When a contractor challenges the government's default termination of his contract, the government bears the burden of proof as to the propriety of said termination."). The government, therefore, must establish that the default termination was based on "good grounds and on solid evidence." *J.D. Hedin Constr. Co.*, 408 F.2d at 431; *see also McDonald Douglas Corp.*, 323 F.3d at 1016; *Moreland Corp. v. United States*, 76 Fed. Cl. 268, 284 (2007); *Becho Inc.*, 47 Fed. Cl. at 600. As this court recently observed, "[t]hese principles apply with equal force where the Government has terminated a lease." *Moreland*, 76 Fed. Cl. at 284.

### A.    The Nature of the Government's Burden of Proof

Yet, the parties disagree as to what defendant must prove. Plaintiff asserts that defendant must demonstrate that there was a material breach of the Lease – a failure of consideration. Only in that instance, plaintiff claims, could defendant walk away from the contract. Not so, defendant remonstrates, asserting that common law concepts like "material breach" and "constructive eviction" are not controlling here. The question, it contends, is whether the termination here was proper under the default termination clauses in the Lease. Defendant claims that it need only demonstrate that the CO's decision to invoke one of these clauses was proper.

The concept of a default termination, of course, is nothing new and predates the FAR (not to mention its predecessor, the Federal Procurement Regulation ). *See United States v. O'Brien*, 220 U.S. 321, 325 (1911) (discussing this concept); *King v. United States*, 37 Ct. Cl. 428 (1902) (same). Under the common law, a party to a contract has long been able to exercise a remedy equivalent to a default termination when there is an "uncured material failure." *See* Restatement (Second) Contracts § 237 (1981); *see also Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1381 (Fed. Cir. 2004). Courts describing such material failures often interchangeably use phrases like "failure of consideration" or "material breach," the latter defined as a breach that "relates to a matter of vital importance , or goes to the essence of the contract." *Lutz v. U.S. Postal Serv.*, 485 F.3d 1377, 1381 (Fed. Cir. 2007) (quoting *Thomas v. Dep't of Hous. & Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997)); *see also, e.g., Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1251-52 (Fed. Cir. 2007). As has been noted, "[t]he presence of the default clauses in government contracts has raised the question of whether these common law concepts are applicable to federal contracts." John Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagles, Administration of Government Contracts 888 (14th ed. 2006). These comments, in turn,

- 18 -

beg the threshold question here – must defendant demonstrate that there was a material breach of the Lease, *e.g.*, a constructive eviction, in order to show that the CO properly exercised the clauses in the Lease authorizing a termination for default?

The answer is – it depends. No case answers this question definitively for all types of cases. That said, there is little doubt that the United States, like any other contracting partner, has the right to enforce the terms of its contracts. As such, a sound argument exists that defendant is obliged to demonstrate only that a failure to perform arose that warranted, under the relevant contract clauses, a termination for default and need not show, in addition, that the failure amounted to a "material breach." The Federal Circuit indicated this in *Kelso v. Kirk Bros. Mechanical Contractors, Inc.*, 16 F.3d 1173 (Fed. Cir. 1994). At issue there was whether the contractor's failure to maintain pay records as required by the "Payrolls and Basic Records" clause of the contract warranted a termination for default. The contract's "Termination/ Debarment" clause warned that noncompliance with this payroll clause constituted grounds for termination for default. Notwithstanding, the Armed Services Board of Contract Appeals held that the failure to maintain pay records was not grounds for termination because it appeared that the contractor's failures to maintain those records were "inadvertent." The Federal Circuit reversed. It held that even though the recordkeeping requirements were "not related to contract performance," they were "not mere technicalities" and "as incorporated into strict contract terms, bind a contractor." 16 F.3d at 1176. As such, it concluded, the contractor's failure to comply with these standards "may justify a default termination." *Id.* Importantly, in reaching this conclusion, the Federal Circuit "did not discuss, or even mention, the material breach requirement." Ralph C. Nash & John Cibinic, "Default Termination for Failure to Comply with 'Other Provisions:' Requiring Contractors to Do the Complete Job," 8 No. 4 Nash & Cibinic Rep. ¶ 24 (1994).

*Kelso* thus stands for the proposition that defendant may terminate a contract for default based upon the specific terms of the contract, even if the failure giving rise to that default is not a "material breach" under the common law. While, under this rule, the provision whose violation gives rise to the default may not be a mere technicality, the breach itself need not be "material," in the sense that it represents a failure of consideration. Support for this view may be found in cases, like *Kelso*, that have sustained terminations based upon specific default clauses in a contract, with no discussion about whether the failure also constituted a "material breach."[26] The

---

[26] *See*, *e.g.*, *Schlesinger v. United States*, 390 F.2d 702, 706-07 (Ct. Cl. 1968) (failure to deliver designated number of navy caps authorized default under specific default clause in contract); *Emiabata v. United States*, 2012 WL 171882, at *4-5 (Fed. Cl. Jan. 18, 2012) (holding that termination for default was appropriate under specific clause in Postal Service contract); *Ballantine Labs., Inc.*, 88-2 B.C.A. ¶ 20,660 (1988) (holding that termination for default was appropriate under supply contract clause requiring compliance with Buy American Act); *see also McGee Const. Co. v. Neshobe Dev., Inc.*, 594 A.2d 415, 417 (Vt. 1991) ("contracting parties can define what will constitute a material breach of their contract"); *Spotsylvania Cnty. Sch. Bd. v. Seaboard Sur. Co.*, 415 S.E.2d 120, 125-26 (Va. 1992) (it was reversible error to instruct the jury that the owner was required to prove that the contractor materially breached the contract in order to be entitled to terminate the contract, where the contract permitted termination merely upon a

rule in these cases does not apply if, instead of referring to the failure to perform a specific provision of the contract, the default clause more generally states that termination may occur based upon the failure to perform "any of the other provisions of this contract" or language to that effect.  In the latter situation, the decisional law instead holds that the "other" provision violated must be a "material provision" of the contract.[27]

Accordingly, the burden of proof placed on defendant in a given case depends upon the particular contract clause involved and, specifically, whether thereunder the default arises from: (i) a failure to perform a contract requirement enumerated in the default provision (as was the case in *Kelso*); or (ii) a failure to perform one of the "other provisions" in the contract.  Cibinic & Nash, "Default Termination for Failure to Comply with 'Other Provisions,'" *supra*.  In the former instance, defendant need not show that the failure constituted a material breach; in the latter, it must show that the breach was material.

This conclusion makes particular sense given the anomalous consequences that would flow if plaintiff's contrary position were adopted.  Except as modified by statute or regulation, the "rights and duties" contained in a government contract "are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States*, 292 U.S. 571, 579 (1934); *see also United States v. Winstar Corp.*, 518 U.S. 839, 887 (1996).  This is a two-way street:  while the United States is "as much bound by [its] contracts as are individuals," *The Sinking Fund Cases*, 99 U.S. 700, 719 (1879), so too the United States "has rights . . . similar to those of individuals who are parties to such instruments." *Perry v. United States*, 294 U.S. 330, 352 (1935); *see also Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed. Cir. 1988).  On the latter count, it is well-accepted that defendant may, via the common law, abandon a contract if its contracting partner commits a material breach.[28]  As such, if every default termination had

---

substantial violation of contract provisions, thus imposing a more onerous burden of proof on the owner); *Massachusetts Mun. Wholesale Elec. Co. v. Town of Danvers*, 577 N.E.2d 283, 294-95 (Mass. 1991) (any common meaning of default may be altered by express or implied agreement of the parties).

[27] *See, e.g.*, *Brandywine Prosthetic-Orthotic Svc., Ltd.*, 93-1 B.C.A. ¶ 25,250 (1992) ("To sustain a default for failure to perform other provisions of the contract, the Government must establish that the Contractor breached a material provision of the contract . . . "); *Precision Prods.*, 82-2 B.C.A. ¶ 15,981 (1982) ("to sustain a default termination, the Government must demonstrate that the breach of other provisions, not pertaining to accomplishment of the contract work itself, constituted a material breach"); *see also*  Nash & Cibinic, "Default Termination for Failure to Comply with 'Other Provision,'" *supra*; Cibinic, Nash & Nagle, *supra*, at 915-16.

[28] *See Moreland Corp.*, 76 Fed. Cl. at 285-86 (where provisions of lease did not afford agency the right to terminate, "[t]o have a basis for default termination, the Government must show a constructive eviction"); *Venegas*, 98-1 B.C.A. ¶ 29,690 (1998) (after defendant lost the right to terminate the lease under the default clause, it "nevertheless, had the right to terminate the lease if there were an uncured, material failure to perform (or breach) by [the lessor]");

to be supported by proof of a material breach, defendant would gain nothing from including default provisions in its contracts. Those clauses would be mere surplusage. Indeed, defendant arguably would be better off not to employ such clauses, which, unlike under the common law, typically impose procedural requirements on a termination for default, *e.g.*, the sending of a cure notice. To give those default clauses some meaning, one must conclude that while defendant may, upon the occurrence of a material breach, terminate the contract either under the default clause or the common law, it may also invoke specific clauses in the contract that authorize default upon particularized failures without having to show that such failures constituted a material breach.

Often, then, determining whether a termination is appropriate is a two-stage process: First, the court examines whether defendant has demonstrated that the default was proper under clauses in the contract providing for specific events of default. If defendant makes such a showing, the liability phase of the case ends. If it does not or cannot, the focus shifts to whether the contractor's failure to perform constituted a material breach, so as to excuse defendant's abandonment of the contract under either a generic "other provisions" default clause or under the common law.[29] In the context of a lease, the latter inquiry often turns on whether the lessor's actions effectuated a constructive eviction of the United States as lessee. *See Moreland*, 76 Fed. Cl. at 287 (considering whether defendant committed a material breach of the contract only after concluding that the termination was not authorized under the default provisions of the contract); *Venegas*, 98-1 B.C.A. 29,690 (1998) (same).

### A.   Did Chicago Ridge's Conduct Breach the Lease, Thereby Allowing Defendant to Terminate the Contract for Default?

So the first question here is whether a specific provision in the Lease authorized the termination. The default termination clause in the Lease listed two events that could be viewed as default by plaintiff: (i) the failure to maintain, repair, operate or service the premises as and

---

*Kwok*, 90-1 B.C.A. ¶ 22,292 (1989) ("In the absence of a termination for default provision in the executory portion of the lease, the Government retains its common law right to terminate the lease where there has been an uncured material failure to perform."); Ralph C. Nash, "Termination After Contractor Material Breach: A Foolish Move," 22 No. 4 Nash & Cibinic Rep. ¶ 26 (2008) (hereinafter "Nash") ("The fact that the contract contains a default termination clause should never be taken to indicate that this is the sole course of action available to the Government when the contractor breaches the contract."); *see generally*, *Danzig v. AEC Corp.*, 224 F.3d 1333 (Fed. Cir. 2000) (allowing government to terminate contract based on common law concept of anticipatory repudiation).

[29] The order of these inquiries can flip in a particular case. *See* Nash, *supra* (suggesting that, in an appropriate cases, the United States should claim material breach, but not invoke the termination for default clause in a contract). In some instances, it may be more appropriate for defendant to press one or the other theories depending upon the nature of the relief sought or whether a given theory is being used as a basis for recovery or solely as a defense.

when specified in this lease, provided any such failure remained uncured for a period of thirty (30) days after plaintiff's receipt of cure notice; or (ii) the repeated and unexcused failure by plaintiff to comply with one or more requirements of the Lease even if one or all of those failures were timely cured.  Defendant claims that its termination of the Lease for default was authorized by both of these clauses.

### 1.    The Default Clause:  Notice and Cure Requirements

Turning to the first of these provisions, it might appear, at first blush, that the termination here was improper because of lack of notice.  That provision states that a default occurs where the failure "shall remain uncured for a period of thirty (30) days" after the Lessor received a "notice thereof from the Contracting Officer . . ."  Here, however, the CO gave plaintiff only two weeks to cure the alleged default.  At trial, she conceded this was an error.  Indeed, it is well-accepted that "the termination of [a] contract by defendant without giving the plaintiff the [specified] written notice as required by the . . . contract constitute[s] a wrongful termination of the contract."  *Bailey Specialized Bldgs., Inc. v. United States*, 404 F.2d 355, 363 (Ct. Cl. 1968); *see also Kisco Co., Inc. v. United States*, 610 F.2d 742, 751 (Ct. Cl. 1979); *DeVito*, 413 F.2d at 1154-55; *NCLN20, Inc. v. United States*, 99 Fed. Cl. 734, 755 (2011); *Composite Laminates, Inc. v. United States*, 27 Fed. Cl. 310, 317 (1992).

But, there are important exceptions to this rule.  Among them is the concept that where a contractor renounces performance or indicates an inability or unwillingness to cure, the cure period need not be honored.  *See, e.g., Kennedy v. United States*, 164 Ct. Cl. 507, 539-40 (1964); *Zoda v. United States*, 180 F. Supp. 419, 424 (Ct. Cl. 1960).[30]  That is what happened here.

---

[30]  In *Composite Laminates*, 27 Fed. Cl. at 322, this court cited a variety of Board decisions that had "permitted the government to terminate contracts when no cure period was specified, or even if a cure notice is not issued, when the contractor demonstrates a clear determination not to perform."  Continuing in this vein, the court stated – "[f]or example, when the contracting officer did not specify a cure period, but there is no evidence that the contractor would have performed any differently had there been a period specified, a termination for default is not considered improper simply because no cure period was specified."  *Id.* (citing, *inter alia*, *Harold Burgmayer Real Estate, Inc.,* 88-3 B.C.A. ¶ 21,063 (1988)); *see also Shubhada Indus., Inc.*, 08-1 B.C.A. ¶ 33,733 (2007) (in the event of anticipatory repudiation, government may terminate the contract without giving 10-day cure notice required by FAR 52.249-8); *Geo-Marine, Inc.*, 05-2 B.C.A. ¶ 33,048 (2005) (cure notice not required in case of repudiation "because sending such a notice would constitute a useless, futile act"); *Integrated Sys. Group, Inc. v. Social Security Admin*, 98-2 B.C.A. ¶ 29,848 (1998) (same); *Polyurethane Prods. Corp.*, 96-1 B.C.A. ¶ 28,154 (1996) (same); *cf. NCLN20, Inc. v. United States*, 99 Fed. Cl. at 756.

The result in these cases makes sense in light of cases holding that a default termination may be justified "by the circumstances at the time of termination, regardless of whether the Government originally removed the contractor for another reason."  *Kelso*, 16 F.3d at 1175; *see also Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357 (Fed. Cir. 2004); *Joseph Morton Co. v. United States*, 757 F.2d 1273, 1277 (Fed. Cir. 1985).  The latter rule has been

When it received the cure notice sent by the CO, Chicago Ridge immediately responded that it would be unable to effectuate the necessary cure until months after the deadline specified. Chicago Ridge indicated that it had concluded that "the proper course of action will require an entire new roof SYSTEM." (Emphasis in original). Regarding timing, it explained that "[t]he requisite planning alone will be more than a month past your deadline," adding that "[t]he scheduling . . . and performance would not put a solution in view until the end of summer." This communication thus made amply clear that the requisite cure would not be forthcoming during a full thirty-day cure period or any other remotely comparable period. Given this, plaintiff should not be heard now to complain that the CO failed to wait the full thirty days before terminating the Lease for default. Accordingly, the court concludes that, despite having given less than thirty days notice, defendant could terminate the contract under the first provision of the default clause.

### 2.  Did Chicago Ridge fail to maintain, repair, operate or service the premises, so as to warrant default?

Under this first provision, a default arose when the lessor failed to maintain, repair, operate or service the premises as and when specified in the Lease. Like the one at issue in *Kelso*, this provision is one that lists specific events of default. Accordingly, defendant may demonstrate that this provision was triggered without showing that plaintiff's conduct effectuated a material breach of the contract.

There is no debate that the requirement to repair and maintain the Building was a key and material requirement of the Lease. The parties, however, dispute the magnitude (and corresponding impact) of plaintiff's failures to perform this requirement. While defendant claims that these failures occurred in several different areas involving maintenance and repair, it principally focuses upon two: (i) plaintiff's failure to address serious leaks that hampered the Building; and (ii) its failure to address various problems experienced with respect to the Building's heating and air conditioning. The court will consider these matters *seriatim*.

### a.     Leaks

Throughout its nearly four-year occupancy that ended in February of 2008, the IRS was plagued by persistent and recurring roof leaks, as well as water seepage from an improperly sealed window. Prior to the default termination, in fact, there were at least thirty-six recorded instances of leaking water in the Building, twenty-five of which occurred in the year leading up

---

regularly applied even though the contractor, by definition, is not afforded a notice to cure the alternate grounds. Reconciling these cases with those enforcing the cure notice requirement, courts have held that use of an alternate ground to support a termination is appropriate where it is clear that the contractor could not have cured the alternate default within the cure period. *See*, *e.g.*, *Glazer Constr. Co., Inc. v. United States*, 52 Fed. Cl. 513, 530 (2002); *McDonnell Douglas Corp. v. United States*, 35 Fed. Cl. 358, 374 (1996), *rev'd in part, vacated in part and remanded on other grounds*, 182 F.3d 1319 (Fed. Cir. 1999), *cert. denied*, 529 U.S. 1097 (2000). A similar rationale applies here.

to the default termination.  The accompanying timeline, which lists the date and essential nature of the leaks, provides a sense of the periodicity of these events:



(A full-page version of this graphic also appears in the appendix to this opinion).  As can be seen, the problems experienced by the IRS reached a crescendo in April of 2007, shortly before the decision was made to send plaintiff a cure notice.

Of course, this timeline only begins to tell the story of the impact that these leaks had on the IRS.  For one thing, the entries on the timeline tend to understate the problem:  they sometimes correspond to multiple leaks experienced on a given day or to leaks continuing over more than one day (*e.g.*, the five leaks that occurred on April 24-25, 2007).  Moreover, while this graphic roughly distinguishes between stained tiles and minor leaks (depicted in green) and more significant leaks (depicted in blue), this color-coding captures neither the full magnitude of the leaks nor their impact on the IRS personnel affected.  A second graphic, the color-coded map that is attached to this opinion, helps to paint more of that picture, showing that the leaks affected nearly one out of two occupied offices on the perimeter of the second floor, and disproportionately impacted the supervisor offices that were located on those outer walls.

So how bad were these leaks?  To be sure, some of them were minor and only resulted in discolored ceiling tiles.  Others, however, caused major disruptions, impacting significant areas of the second floor, including common areas, like hallways and the break room.  These major leaks created, at times, a soggy mess – water running down walls and puddling on desks; soaked ceiling tiles that sometimes bulged and, in other instances, collapsed; wide circles of saturated carpeting fed by water from ceiling leaks; and, as might be expected in an office building, wet desks and equipment.  The repeated leaks caused some IRS personnel to move – some temporarily, others for longer periods.  In other instances, IRS employees had to relocate their computers and furniture to other parts of their relatively small offices to escape the water hazards.  Hours accumulated into days as IRS and GSA employees were forced to deal with these leaks instead of doing their assigned work – forced to use waste paper baskets, trash bins and, in one instance, shower curtains, to catch dripping water; shifting equipment around and

among offices to escape damage; placing plastic over computers and other electrical equipment; and responding to many dozens of service calls. These leaks created what at least appeared to be unsafe working conditions – with water leaking down through light fixtures and the damp conditions causing at least one instance of mold.[31]   In other situations, the adverse effect of the leaks on productivity was more subtle, yet still palpable – as with the IRS employees who had to endure their own private version of the Hippolytus water torture while sitting in their offices for days listening to the pitter and patter of leaks on someone else's ceiling and wondering when they would see the first signs that the dripping water had entered their domain.

In the court's view, the cumulative effect of these many irregularities deprived defendant of a critical aspect of the Lease – the safe and reliable work environment for which it bargained in the contract.[32]   To put it in the terms of the Lease, the court finds that plaintiff failed repeatedly to maintain the premises "in good repair and condition" so as to permit the IRS with "use and enjoyment" of the Building within the meaning of clause 14 of the Lease.

In response to this litany, plaintiff boldly asserts that it should not be held responsible because it did all that it could to address the leak problem. The record indicates otherwise.

Surely, plaintiff made a great number of attempts to repair the leaks in the Building. But, that number, in a sense, is damning, for it hints at what the rest of the record demonstrates: that plaintiff's efforts were often untimely, unsystematic, incomplete and, not surprisingly, ineffective. During the less than four years the IRS occupied the Building, plaintiff hired at least eight different contractors to analyze and repair the roof. Of course, one reason this succession occurred is because the leaks persisted. Another reason is because the firms hired by Chicago Ridge were mostly not up to the tasks at hand. Defendant's expert on building envelopes, Niklas Vigener, convincingly testified about these points. He thoroughly discredited the notion that there were any inherent flaws in the design of the roof, demonstrating that proper execution of the GSA-approved design by a qualified contractor would have prevented any leaking. Reviewing, in detail, the initial construction of the roof, as well as the subsequent repairs made

---

[31]   Plaintiff notes that there was no proof that the leaks coming through light fixtures were actually dangerous, seemingly discounting how an employee might react to the combination of electricity and water. Moreover, it should not be overlooked that on January 27, 2005, the National Treasury Employees Union filed a mass grievance with the IRS on behalf of the IRS employees at Chicago Ridge citing, *inter alia*, the problems posed by repeated leaks.

[32]   In the court's view, Chicago Ridge captured the situation well in the complaint that it filed against the architects and contractors who constructed and repaired the Building, stating at one point that "[t]he extent of the leaking was so great as to constitute a series of sudden and calamitous events," and at another, averring that "the leaks in the Building were so substantial that they destroyed numerous ceiling tiles, stained and damaged carpeting, . . . destroyed, damaged, or otherwise made unusable IRS property, equipment, work stations and other property within the Building."  First Amended Complaint, *5860 Chicago Ridge, LLC v. Valerio Dewalt Train Assoc., Inc.*, Doc. No. 08-1930 (Apr. 15, 2009).

thereto, he identified and explained various shortcomings in Chicago Ridge's management of the process, including, in particular, its failure to conduct a full investigation into the sources of the leaks and its correlative tendency to approach repairs on a piecemeal basis.  He also testified that most of the firms plaintiff hired were general contractors or otherwise ill-trained to investigate and address the specialized problems presented by the roof of the Building.[33]  And to demonstrate this further, he showed how the leaks could have been fixed without impeding the IRS' access to the Building.[34]

The record confirms Mr. Vigener's view.  For example, it reveals that the problems in Ms. Prophet's office were visible to the naked eye – an email from a GSA property manager indicates that daylight could be seen through a seam in her wall – yet were not repaired until the IRS vacated the Building in 2008. The record also corroborates that early efforts to repair the roof were not preceded by adequate study of why the roof was failing – leading to a series of half-measures and patches that did not work because they failed to address the fundamental issues associated with the roof design, particularly the placement and drainage around the roof-top HVAC unit.  A numbing repetition of leaking, patching, testing, and premature declarations of success – followed by more leaking, patching, testing, etc., played over and over again, like a broken record.  Moreover, when plaintiff was presented with comprehensive solutions, it hesitated.  Such was the case with early proposals to rechannel the water around the roof-top HVAC unit and to install insulation under the roof to deal with the condensation problem – proposals that were not pursued well after they were first proposed.  Chicago Ridge, moreover, did not offer up the possibility of replacing the entire roof until it was staring down at GSA's cure notice.  And, indeed, Chicago Ridge never followed through on this replacement – notable because plaintiff's successor in ownership, upon further investigating the problems with the roof, discovered an improperly sealed vent that led it to install an entirely new roof on the Building.  At which point, tellingly, the leaks stopped.

But, to a certain extent, this discussion misses the point:  for the relevant clauses in the Lease did not merely command plaintiff's diligence in responding to the Building's leaks; they demanded an effective response that would stop the leaks.  Defendant did not contract only for

---

[33]  In this regard, Mr. Vigener's report noted that "[i] was not until April 2007, nearly three years after IRS moved into the building and shortly before GSA issued the final cure notice prior to termination of the lease, that Chicago Ridge engaged the services of an appropriately qualified and experienced professional, Mr. Krogstad with WJE, albeit only to perform limited investigative work."  Even then, Mr. Vigener further explained, Chicago Ridge failed to follow Mr. Krogstad advice that they delay repairs, like installation of the insulation under the roof, until WJE had time to do a more extensive analysis of the roof.

[34]  In this regard, Mr. Vigener asserted that the fatal flaw in plaintiff's approach was its failure to employ a more systematic approach to identifying the leakage paths.  In addition, defendant's expert agreed with a number of the assessments made by WJE, including that the curb around the RTU needed to be reconfigured and the roof flashing at the steel supports for the RTU needed to be reconstructed.

plaintiff's best efforts – it leased a building that was not supposed to leak in a way that, over a period of years, impaired the IRS' ability to use the premises for their intended purposes.  That is the contract plaintiff signed and the one to which it must be held.  Accordingly, even if plaintiff believes that it deserves an "A" for effort (a debatable point, to be sure), it definitely earns an "F" for effectiveness, at least when measured in terms of meeting the contract's requirement that the Building be kept in "good repair," so as not to disrupt defendant's "occupancy, possession, use and enjoyment of the premises."  Because of this, defendant was within its rights in terminating the Lease for default.

In arguing to the contrary, plaintiff makes several flawed assertions.  The first is a repetition of its banner claim that, to prove the termination was proper under the Lease terms, defendant must show that the leaks served to render the Building untenantable.  But, as has been demonstrated, defendant need not prove that the IRS was constructively evicted in order for this court to conclude that the termination for default here was proper. [35]  All it must prove is that plaintiff failed to comply with a substantive requirement of the Lease specifically identified in the default clause.  And it has done that.

Plaintiff's next faulty premise is that defendant was required to exercise less severe remedies under the Lease, such as repairing the roof on its own, before it could invoke the default clause.  But, nothing in the Lease establishes such an absolute hierarchy of remedies.  *Per contra*.  The clause that authorized the repair remedy emphasized flexibility, stating that the remedies listed therein "are not exclusive and are in addition to any other remedies which may be available under this lease or at law."  Of course, GSA did invoke – albeit unsuccessfully – the other remedy provided by this same clause, namely, the rent reductions.  Certainly, nothing in the decisional law required defendant to cycle up through every lesser remedy in the Lease before it could declare a default.  *See Union Chem. Co.*, 85-3 B.C.A. ¶18,489 (1985); *see also*

_____

[35]  For a host of reasons, this case is distinguishable from *Moreland*, 75 Fed. Cl. 268, in which the court overturned the government's default termination of a lease for a build-to-suit building due to the lessor's failure to repair structural deficiencies.  The problem in *Moreland* did not involve leaks, but insufficient structural support – a deficiency that the court characterized as a latent defect that could not have been discovered by reasonable inspection. 76 Fed. Cl. at 284-85.  That characterization was important because the lease in *Moreland* incorporated the warranty of construction clause found at FAR § 52.246-21.  That clause specified that upon discovery of a latent defect, the lessor should fix the defect itself, or failing that, the government could arrange for the repair at the lessor's expense.  This court noted, critically, that neither this clause nor any other provision of the lease authorized the government to terminate the lease for default based upon the presence of such latent defects.  The court accordingly held that the default could not be justified based upon the contract.  It was only because of this finding that the court proceeded to consider whether the termination could be justified under the common law remedy of constructive eviction." *Id*. at 285-86.  *Moreland* does not suggest, then, that defendant must support a termination for default by showing that it was constructively evicted from a building, but only held that defendant must do so if the contract does not provide a specific basis for a default.  Here, however, the Lease does provide such a remedy.

*Washington Dev. Group-JWB, LLC v. Gen. Serv. Admin.*, 03-2 B.C.A. ¶ 32,319 (2003).  As was said in another case involving a leaky roof, "[w]ere we to hold [that defendant had an obligation to repair the roof], we would be requiring the Government to give up a right it had bargained for, namely, the right to have the premises maintained by lesser." *Kwok*, 90-1 B.C.A. ¶ 22,292.  Nor is plaintiff remotely correct suggesting that because GSA elected to pursue one remedy, *i.e.*, rent reductions, it could not pursue a default unless the leaks worsened.  This forbearance argument is akin to a waiver argument typically made – and rejected – in default cases.  *See Olson Plumbing & Heating Co. v. United States*, 602 F.2d 950, 955 (Ct. Cl. 1979) (government did not waive right to terminate for default when it first assessed liquidated damages); *Indemnity Ins. Co. of N. Am. v. United States*, 14 Cl. Ct. 219, 224-25 (1988) (same); *see also Pelliccia v. United States*, 525 F.2d 1035, 1043  (Ct. Cl. 1975); *DeVito*, 413 F.2d at 1153-54.[36]

Finally, plaintiff argues that while each failure to stop a leak was technically a default, these failures neither individually nor collectively constitute a substantial failure to perform the requirements of the contract, so as to warrant a default termination.  This argument might be more persuasive were this case about a single leak, or perhaps a scattering of leaks that occurred over years.  But, this case involves nearly six dozens leaks or sets of leaks that occurred repeatedly over more than three years – many at the same locations and with significant consequences to the Building's occupants.  It is the accumulated impact of these leaks that leads the court to conclude that plaintiff failed to repair and maintain the Building in the fashion anticipated by the Lease.  As was said by this court in *Cervetto Building Maintenance Co. v. United States*, 2 Cl. Ct. 299 (1983), in upholding the government's termination of a janitorial services contract –

> [I]t was intended that minor deficiencies be the exception and that performance be satisfactory on most days.  When deficiencies become the rule, as they did in this case, necessitating corrections or deductions virtually every day, overall

---

[36] Chicago Ridge asserts that GSA lost the right to terminate the Lease for default when, despite the problems encountered with the leaks, it continued the contract and availed itself of the Lease's rent reduction provisions.  It contends that GSA waived its right to terminate when it failed "to take action to end the agreement within a reasonable time after becoming aware of the facts."  *Cities Service Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976).  But, plaintiff's reliance on *Cities Service Helex* is problematic for several reasons.  For one thing, the language quoted by plaintiff is taken out of context and refers only to what the court described as the "strict formulations of the election doctrine."  *Id.* at 1313.  The Court of Claims, however, noted that there are a number of formulations of this doctrine and that under the modern view of election found in the Uniform Commercial Code, "'[w]hether the pursuit of one remedy bars another depends entirely on the facts of the individual case.'"  *See id.* at 1314 (quoting Uniform Commercial Code § 2-703, Cmt. 1).  The court held that the plaintiff in that case had waived its right to claim a ***past*** material breach under any formulation of the election doctrine when both parties had continued to perform under the contract.  *Id.* at 1314-15.  The court did not hold that, once that performance continued, a party forfeited its right to assert that ***future*** conduct gave rise to a material breach that terminated the contract.

performance under the contract can be deemed unsatisfactory even though individual problems are resolved.

*Id.* at 301; *see also Mut. Maint., Inc.*, 91-1 B.C.A. ¶ 23,287 (1990) ("although it would not be appropriate to terminate for default a contract of this nature for minor instances of inadequate performance, a high level of aggregate deficiencies may eventually justify such action"); *Pulley Ambulance*, 84-3 B.C.A. ¶ 17,655 (1984); *C.S. Smith Training, Inc.*, 83-1 B.C.A. ¶ 16,301 (1983); Cibinic, Nash & Nagle, *supra*, at 903.  Contrary to plaintiff's claims, under the Lease, the IRS and GSA were not obliged to suffer through a full ten years of leaks that plainly disrupted the IRS' operations simply because no one instance of those leaks was serious enough to drive the IRS from the Building.

In sum, the court finds that the extensive problems that defendant experienced with leaks in the Building, and plaintiff's ineffective response thereto, constituted a failure to maintain, repair, operate or service the premises as and when specified in this Lease, thereby authorizing defendant to terminate the Lease for default.[37]  Based upon this finding, the court need not consider defendant's claims regarding the operation of the Building's HVAC system.   However, the court believes that it is important to clarify whether, and to what extent, these problems provided a further basis for defendant's default termination.

### b.      HVAC Problems

Although both GSA and IRS had previously complained about the HVAC system in the Building, the notice of default sent by GSA to Chicago Ridge did not cite this problem. However, as noted above, the court may sustain a default termination based on "the circumstances that existed at the time of termination," regardless of whether that reason was listed in either the cure notice or termination decision.  *See Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357 (Fed. Cir. 2004); *Kelso*, 16 F.3d at 1175; *Joseph Morton Co.*, 757 F.2d at 1277.  Accordingly, the court may consider the impact that the problems with the HVAC system had on defendant's decision to terminate the Lease for default.

The Lease contains several HVAC performance requirements, among them section 6.7(a), which required that "[t]emperatures shall conform to local commercial equivalent

---

[37]  Because the court concludes that the default termination here was authorized by the first clause in the default provision, it need not consider whether the termination would also have been authorized by the second clause therein.  To support default termination under the latter provision, defendant likely would have to show that it was constructively evicted from the Building.  The court believes that defendant has made a strong showing in this regard.  But, the case law on this issue is somewhat ill-defined and very conflicting, with different courts faced with similar fact patterns seemingly coming to different results.  *See* Robert A. Shapiro, "Landlord and tenant: constructive evicting based on flooding, dampness, or the like," 33 AL.R. 3d 1356 §§ 3[a], 3[b] (2011).  The court believes it is unnecessary to wade into this thicket, as it is convinced that defendant was within its rights to terminate the contract under the first clause.

temperature levels."  It is essentially undisputed that the phrase "local commercial equivalent temperature levels" refers to ASHRAE Standard 55, which requires temperatures in the heating season to range from 68 degrees to 74 degrees and in the cooling season to range from 73 degrees to 79 degrees.

The record contains numerous complaints from GSA and IRS personnel regarding the temperatures experienced in the Building, including seventy-one separate maintenance tickets that were filed between November 2004 and August 2007 complaining of temperatures that were either too hot or too cold.  Some of those complaints plainly reflect temperatures that did not conform to the ASHRAE standard and thus were outside the range specified in the Lease.  Plaintiff, for example, does not contest that, on November 26, 2004, and December 28, 2004, many IRS employees were sent home because temperatures on the second floor dipped below 62 degrees.  Nor does it deny that on other days in January of 2005 the temperatures in the Building were well below the ASHRAE standard.  Indeed, during this month, Chicagoland employees set up space heaters in the Building to counteract the lack of heat.  Claims that the Building was too cold during this period are also corroborated by the grievance filed by the local chapter of the National Treasury Employees Union on January 25, 2005.  The question, though, is not whether the Building was too hot or cold in 2004 or 2005, but whether the temperature problems persisted until May of 2007, the time of the termination decision.  Defendant has not shown adequately that the latter is the case.

For one thing, unlike with the leaks, the evidence suggests that Chicago Ridge changed the HVAC system in a way that appears to have significantly addressed the problems that were previously experienced.  Thus, the number of complaints about the HVAC system dropped precipitously beginning in December of 2005, when Chicago Ridge purchased and began adding to the HVAC system thirteen perimeter in-line duct heaters.  True, there were further complaints after this installation and before the default termination in 2007.  But, unlike for the period prior to December of 2005, defendant has not shown that any significant degree of these claims actually correspond to temperatures that were outside the ranges specified in the Lease.  Indeed, only three of the eleven temperature-related tickets filed in the first four months of 2007 – all filed by the same individual in the first week of February – actually list a temperature outside the acceptable Lease range.  There is no indication in the record how these temperatures were measured and thus no way to know whether the claims were accurate.[38]  That the remainder of the tickets during this period list no temperatures – but merely indicate that the temperature is too hot or too cold – leaves open the possibility that these complaints reflected nothing more than the personal preferences of the individuals involved.  Of course, GSA had technology available that

---

[38]  The individual in question filed complaints on February 5, 2007, and February 9, 2007, both times asserting that the temperature in her office was 64 degrees.  The complaints, however, were filed just after 6:30 am, which is significant because the Lease required plaintiff to reduce the building temperature during the winter down to 65 degrees during the period in which the building was unoccupied – a period that ended at 6:30 am.  This same individual also filed a ticket at 6:30 am on February 6, 2007, citing temperatures between 64 and 68 degrees.  The upper part of this range represents a temperature that was acceptable under the Lease.

would have allowed it to conduct a temperature study to confirm whether the temperatures in the Building during the months leading up to the default were within the ranges required by the Lease. But, it did not perform such a study. And for this and other reasons, the court is left with a record that, in its view, does not establish that the problems encountered with the HVAC system in the months leading up to the default constituted a failure by Chicago Ridge to maintain the premises.

Accordingly, the court concludes that defendant has not shown that plaintiff's handling of the temperature issues in the Building constituted a further failure under the Lease that supports the termination for default.

### D.     Excess Reprocurement Costs

Via its counterclaim, defendant seeks excess reprocurement costs in the amount of $280,962, the wide majority of which relates to relocation expenses ($172,215) and the cost differential between the lease at plaintiff's building and that at Orland Park, the building to which the IRS moved when it left the Building.

#### 1.     Relocation Expenses

"[E]xcess reprocurement costs may be imposed only when the Government meets its burden of persuasion that the following conditions (factual determinations) are met: (1) the reprocured supplies are the same as or similar to those involved in the termination; (2) the Government actually incurred excess costs; and (3) the Government acted reasonably to minimize the excess costs resulting from the default." *Cascade Pac. Int'l*, 773 F.2d at 293-94; *see also Armour of Am. v. United States*, 96 Fed. Cl. 726, 759 (2011). If defendant sustains its burden, the burden then shifts to the plaintiff for rebuttal. S*ee Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1300-01 (Fed. Cir. 2002).

Under the first prong of this test, that the reprocured item is "the same or similar to those involved in the termination," the court must compare "the item reprocured with the item specified in the original contract." *Cascade Pac. Int'l*, 773 F.2d at 294; *see also Lassiter v. United States*, 60 Fed. Cl. 265, 271 (2004). As used in this context, the word "similar" means "similar in physical and mechanical characteristics as well as functional purpose." *Armour of Am.*, 96 Fed. Cl. at 760 (quoting *Envtl. Tectonics Corp.*, 78-1 B.C.A. ¶ 12,986 (1978)).[39] In the court's view, defendant has not shown that this prong of the test is satisfied as to the cost differential between the two leases at issue.

The record suggests that the Building and the Orland Park building leased under the reprocurement are materially different. First, at GSA's request, all the critical documents

---

[39]   Defendant argues that in making this comparison, the court should compare only the two solicitations and not the actual buildings that were leased. But, neither logic nor the decisional law limits the inquiry in this fashion.

regarding the procurement that resulted in the selection of Orland Park specifically indicated that the facility had to be a "Class A" building, signaling the highest quality of buildings in the market.  By comparison, the Chicago Ridge solicitation documents did not require that the facility be a "Class A" building, but stated instead only that "[o]ffers must be for space located in a quality building of sound and substantial construction."  Plaintiff's expert on this topic, Gary DeClark, a professional real estate appraiser, testified that the Building, in fact, was not a Class A property.  Mr. DeClark also testified that there were substantial differences between the neighborhoods in which the two buildings in question were located, with the neighborhood around Orlando Park having more desirable features, including being closer to more restaurants, services and a major mall.[40]

Defendant's expert on reprocurement costs, Ms. Redding, is also an appraiser and presumably could have provided detailed opinions regarding the comparability of the two buildings at issue.  But, she did not, instead limiting her testimony on this point to calculating the different costs between the two leases.  For that purpose, Ms. Redding did not adjust her calculations to take into account differences in the quality of the buildings, but merely made adjustments to account for the fact that the Orland Park had more rented square footage than the Building.[41]  She offered no testimony to rebut Mr. DeClark's opinion that the buildings were materially different.  In fact, she inadvertently reinforced his opinion in asserting that plaintiff should have mitigated its damages by re-letting its Building.  For this purpose, Ms. Redding conducted a market survey and concluded that the "full service market rental rate" for the Building for this period would have been $24.00 per square foot.  For the first three years of the Orland Park lease, however, GSA paid an average of $35.60 per square foot annually – nearly fifty percent higher than what Ms. Redding felt was the market rate for the Building.  This is further indication that the two buildings were dissimilar.  The only other evidence defendant offered on this point were the personal observations of the GSA CO and one IRS employee, who testified, in extraordinarily general terms, that they did not see many differences between the two buildings, but who failed to address most of the distinctions raised by Mr. DeClark.  In the court's view, this lay testimony is insufficient to overcome plaintiff's expert evidence showing that the reprocured building here was superior to the Chicago Ridge facility in significant regards.

---

[40]  In making the latter observation, Mr. DeClark looked at businesses within a one-mile radius of the two properties.  While defendant argues that the proper focus should be on businesses within three miles of the properties (a claim that, if adopted, would increase the number of businesses "near" the Building), it failed to substantiate its claim that employees would use restaurants and other services located that far from their place of employment.

[41]  To reach the occupancy cost differential, Ms. Redding determined the base rent terms, accounted for rent increases under the consumer price index, made property tax adjustments, and estimated utility costs.  She then reduced the occupancy cost for Orland Park by a percentage corresponding to the difference in square footage and discounted the values so reached to arrive at an occupancy cost differential of $46,968.

In regards to the relocation costs, defendant also failed, in the court's estimation, to show, with adequate proof, "what it spent in reprocurement." *Cascade Pac. Int'l*, 773 F.2d at 294. Under this factor, defendant must not only provide proof of the expenses it incurred as a result of the default termination, but must also "demonstrate the propriety of such costs." *Rhocon Constructors*, 91-1 B.C.A. ¶ 23,308 (1990). To determine the relocation expenses, Ms. Redding started with GSA's reimbursable work authorization and supposedly reconciled that document with invoices and payment slips for the period between November 29, 2007, and March 25, 2008. She then removed a few expenditures to arrive at a figure of $172,215. While Ms. Redding attached to her various reports the various invoices she used in making her calculations, neither she nor any other of defendant's witness analyzed those invoices to determine whether , and to what extent, the costs reflected therein were necessary for the relocation. Rather, Ms. Redding simply presumed that all the "moving" costs identified by GSA and the IRS that were incurred between November 29, 2007 and March 25, 2008, were appropriately recovered. But, the law in this regard requires proof, not blithe assumptions.[42]

Finally, to establish that it was entitled to reprocurement costs, defendant had to prove that it had obtained the new building and associated moving costs at a "reasonable price" and had otherwise mitigated its losses. *Cascade Pac. Int'l*, 773 F.2d at 294; *see also Astro-Space Labs., Inc. v. United States*, 470 F.2d 1003, 1018 (Ct. Cl. 1972). But, defendant provided no corroboration of the reasonableness of the rents it agreed to pay at Orland Park. In particular, it offered no explanation as to why those rents varied so dramatically over the term of the lease – beginning at $650,000 per year, then going up to $719,797 in the third year of the lease, only to then drop off dramatically to $507,000 in the final two option years of the lease. As compared to the $546,307 flat annual rent provided in the Lease, the highest rent for Orland Park thus was twenty-two percent higher, but the lowest rent was ten percent lower. Further complicating this picture, the only witness to testify for defendant on this issue, the afore-mentioned Ms. Redding, again testified that a reasonable market rent for Chicago Ridge at the time of default was $24.00 per square foot – a figure considerably lower than the figure paid by GSA for the first three years of the Orland Park lease. Accordingly, if, as defendant contends, the two properties are the same or similar, there is indication that the rent paid by GSA for Orland Park was excessive.

---

[42] In seeking reprocurement costs, defendant seems to think that all it needed to do was introduce Ms. Redding's conclusory opinions that a given number was recoverable and have her attach to her report a stack of invoices. However, many of the documents Ms. Redding relied upon do not appear otherwise in the record, raising questions as to whether they should be considered substantive evidence before the court. In this regard, Federal Rules of Evidence 703 and 705 appear to suggest that the facts underlying an expert's opinion do not come into the record as substantive evidence, but rather are admitted only for the limited purpose of enabling the trier of fact to scrutinize the expert's reasoning. *See also United States v. Affleck*, 776 F.2d 1451, 1457 (10th Cir. 1985); *United States v. Wright*, 783 F.2d 1091, 1100 (D.C. Cir. 1986); *see also* 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure § 6273 (1997). But even if these attachments are properly considered substantive evidence, the court is in no position to divine from them the essential factual premises and arguments that defendant neither developed at trial nor argued in its post-trial briefs.

Likewise, defendant provided insufficient evidence as to the reasonableness of the relocation expenses that it seeks. In this regard, Ms. Redding admitted that she and her staff did not examine the individual expenses to exclude items that were not properly includible in damages. She also admitted that they did not get "market based fluid costs" to determine whether those expenditures were actually reasonable. In these circumstances, the expenses in question are not recoverable. Where, as here, the request for reprocurement costs contains "no independent assessment" of reasonableness, any attempt by the court to determine the actual value of the reprocured work on the basis of the evidence before it would be pure speculation." *PBI Elec. Corp. v. United States*, 17 Cl. Ct. 128, 140 (1989). Contrary to defendant's intimations, the court will not assume that the prices paid by defendant for the moving expenses and, for that matter, the lease at Orland Park were reasonable simply because those items were procured via a government procurement process. *See Armour of Am.*, 96 Fed. Cl. at 762; *CJP Contractors*, 45 Fed. Cl. 345, 385-86 (1999). Concluding otherwise would essentially drop the reasonableness inquiry out of the reprocurement cost analysis because all items and services reprocured by defendant necessarily occur in the context of some aspect of the government procurement process and, in defendant's view, would, therefore, be reasonable, *per se*.[43] The law does not permit this shorthand.

## 2.    Other Reprocurement Expenses

Defendant failed to provide any significant evidence to substantiate the remaining three components of its reprocurement costs – $19,549.42 for tenant improvements at the Building, and $8,675 for tenant improvements and $59,794 in a tax credit for Orland Park.

The first charge derives from the contention that defendant paid $30,867.50 for tenant improvements to be used over the ten years of the Lease, but only enjoyed those improvements for three years and eight months. Defendant thus claims that it should be entitled to a ratable refund ($30,867.50 x 63.33 percent (unexpired Lease term) = $19,549.42). There are a number

---

[43] Contrary to defendant's claim, the Federal Circuit did not hold in *Seaboard Lumber Co.*, that where the descriptive terms of a resale contract are not materially different from the original contract, the court must presume that the reprocured product is the same or similar to the original product. *Per contra.* In *Seaboard*, the court instead held that, under *United States v. Axman*, 234 U.S. 36 (1914), if the resale contract is materially different from the original contract, it may be presumed that the reprocured and original products are the same or similar. 308 F.3d at 1297 ("The *Axman* defense provides a complete bar to damages where the non-breaching party, in attempting to mitigate damages, resells a contract on materially different terms than those of the original contract."); *see also id.* at 1298 (citing numerous cases). Aside from the plain language of this opinion, one can readily deduce that the Federal Circuit did not intend the comparison of the two contracts to be determinative of the first prong of the reprocurement analysis because, after determining that the contracts involved in *Seaboard* were not materially different, the court went on to analyze this court's findings regarding the nature of the assets actually acquired under the contracts. *Id.* at 1300-02.

of problems with this claim.  For one thing, the record fails to document adequately what these improvements were, suggesting only that these amounts corresponded to electrical work (phone and data outlets), supplemental air conditioning, mini-blinds, and signage.  Nothing in the record suggests the useful life of these improvements – defendant merely presumes that they would last for the entire ten-year term of the Lease and thus that the "lost" portion of their cost should be recouped.  Wholly apart from this, neither the CO's decision nor anything else in the record identifies the Lease provision that authorizes this recoupment.  And there is a good reason for this – as there is no such provision.  Rather, the Lease deals with this subject by providing that GSA could remove certain tenant improvements upon the termination of the Lease.  No explanation has been provided as to why that did not happen here.  Under these  circumstances, the court is unwilling to permit defendant to recover these costs.

As for the latter two costs ($8,675 for tenant improvements and $59,794 in a tax credit), the record reveals very little beyond the fact that these amounts were paid with respect to Orland Park.  Attachments to Ms. Redding's expert report indicate that the tenant improvements were for "HVAC, Front Doors Saturday, Dr. Signage."  Nothing in the record or in defendant's briefs explains why these costs were somehow chargeable as a cost related to the default termination.  Further attachments to Ms. Redding's report suggest that the tax credit arose from negotiations between GSA and the owner of Orland Park.  Again, though, no clear explanation has been given as to why this credit is chargeable to Chicago Ridge.[44]  Accordingly, the court find that these components are not recoverable, as well.

*          *          *          *          *

Accordingly, based upon the record, the court finds that defendant has failed to establish that it was entitled to any excess reprocurement costs.

### E.    Propriety of Rent Reductions

Another issue in this case involves the propriety of the rent reductions that GSA effectuated beginning in August of 2006.  As the accompanying chart reveals, these deductions

---

[44]  At trial, Ms. Redding's entire testimony on the tenant improvement and tax credit was as follows:

Q:    And what are the final two components of your re-procurement opinion?

A:    The government again in this location directly paid for tenant improvements of $8,675, and they also paid directly the landlord at the new location $59,794 for a tax credit for a total of $287,653.

Q:    And when you say this location, which property are you referring to –

A:    Orland Park.

had two components, one corresponding to the rent associated with the square footage effected by leaks, and the other, an administrative charge:

| Date | Reduction for Space (#02-054, #205, #207, & #214) | Reduction for Administrative Costs |
|------|---------------------------------------------------|------------------------------------|
| September 2006 | $1,378.48 | $3,332.52 |
| October 2006 | $1,378.48 | $3,332.52 |
| November 2006 | $1,378.48 | $3,332.52 |
| December 2006 | $1,378.48 | $3,332.52 |
| January 2007 | $1,378.48 | $3,332.52 |
| February 2007 | $1,378.48 | $3,332.52 |
| March 2007 | $1,378.48 | $3,332.52 |
| April 2007 | $1,378.48 | $3,332.52 |
| May 2007 | $1,378.48 | $3,332.52 |
| June 2007 | $1,378.48 | $3,332.52 |
| July 2007 | $1,378.48 | $3,332.52 |
| August 2007 | $1,378.48 | $3,332.52 |
| September 2007 | $1,378.48 | $3,332.52 |
| October 2007 | $1,378.48 | $3,332.52 |
| November 2007 | $1,378.48 | $3,332.52 |
| December 2007 | $1,378.48 | $3,332.52 |
| January 2008 | $1,378.48 | $3,332.52 |
| February 2008 | $1,378.48 | $3,332.52 |
| Total Rent Reductions | $24,812.64 | $59,985.36 |

Plaintiff challenges both components. It claims that the overall rent reductions were improper because GSA deducted amounts for workspaces that were not abandoned because of the Building's leakage problems. Alternatively, it claims that if the deductions are proper at all, they should be reduced: (i) to reflect the exact number of days that IRS personnel were unable to use the affected space; and (ii) to eliminate the administrative costs.

The Lease incorporated, by reference, FAR § 552.270-10, Failure in Performance, which gave defendant at least two options "[i]n the event of any failure by the Lessor to provide any service, utility, maintenance, repair or replacement required under the lease." Under the first of these options, defendant was authorized "by contract or otherwise," to "perform the requirement and deduct from any payment or payments under this lease, then or thereafter due, the resulting cost to the Government, including all administrative costs." Under the second option, defendant could "deduct from any payment under this lease, then or thereafter due, an amount which reflects the reduced value of the contract requirement not performed." It was this second option that defendant invoked when it began to make rent deductions in August of 2006.

In the court's view, the amount of rent deducted by GSA reasonably corresponded to the reduced value of the Lease resulting from plaintiff's repeated failure to remedy the leaks. In arguing that defendant should be limited to deducting the amount of rent that corresponded to the exact days that IRS personnel were unable to use the affected space, plaintiff again seeks to reintroduce into this case concepts associated with the doctrine of constructive eviction. The provision in question, however, does not condition the use of rent reductions on given portions of

the space becoming untenantable. Rather, they allowed GSA to deduct the "reduced value of the contract requirement not performed." Given the serious nature of the problems experienced, the reduction for the square footage associated with four offices represented a fair, if not conservative, approximation of the value of the requirement not performed, particularly since GSA did not also deduct for the square footage of the common space that was affected by the leaks, such as the Northeast and Northwest Hallways of the second floor of the Building.

The same cannot be said, however, of the deduction that GSA made for administrative costs. There are several problems with this deduction. Most importantly, it does not appear to be authorized by the Lease. Unlike the provision which authorized GSA to deduct the cost of performing a given requirement under the Lease, the provision that authorized rent reductions did not authorize GSA to deduct "all administrative costs." In the court's view, the absence of this language cannot be viewed as incidental and must be construed to indicate that administrative costs are not recoverable as reductions in the Lease payments. Moreover, assuming *arguendo*, that the administrative costs are recoverable, defendant has presented no evidence that shows that the administrative costs GSA and IRS experienced with respect to the leakage problems approximated the $3,332.52 per month that GSA deducted from the rent. When asked about this calculation at trial, the CO essentially admitted that she lacked the records that would allow her to estimate accurately the administrative costs incurred by GSA and IRS officials in dealing with the leak problems. Unlike other contracts, the Lease did not authorize the imposition of liquidated damages – and defendant could not impose the equivalent of such a remedy by slapping an arbitrary fee onto its rent reductions, even if the CO was justifiably frustrated by the continuation of the leaks. Accordingly, the court finds that GSA improperly deducted administrative costs from its monthly rent payments during the period from September 2006 through February 2008. Plaintiff thus is entitled to recover $59,985.36, plus appropriate interest, on this count of its complaint.

## F.    Property Taxes at Chicago Ridge

The Lease contained a series of provisions essentially requiring GSA to make payments designed to offset any increase in property taxes owed by plaintiff as time progressed. The parties disagree as to whether defendant paid the amounts appropriately owed under these clauses, with plaintiff claiming that it is owed reimbursement for taxes and defendant asserting that it overpaid these taxes.

Clause 1.16 of the Lease provided that "[t]he Government shall make a single annual lump sum payment to the Lessor for its share of any increase in real estate taxes during the lease term over the amount established as the base year taxes." For this purpose, "base year taxes" were defined as "the real estate taxes for the first twelve (12) month period coincident with full assessment, or may be an amount negotiated by the parties that reflects an agreed upon base for a fully assessed value of the property." Under this provision, a "full assessment" occurred when "the taxing jurisdiction has considered all contemplated improvements to the assessed property in the valuation of the same," adding that "[p]artial assessments for newly constructed projects or for projects under construction, conversion, or renovation will not be used for establishing the Government's base year for taxes." Finally, under this provision, Chicago Ridge was required to

provide the CO with all notices and evidence of payment relating to the taxes, including all tax bills. And, indeed, the provision repeated several times that defendant would not make any tax payments were this documentation not provided to the CO. Finally, the provision indicated that "[i]f the lease terminates before the end of a tax year, payment for the tax increase due as a result of this section for the tax year will be prorated based on the number of days the Government occupied the space."

The Building was completed and occupied in mid-2004. The following chart summarizes the tax payments that were made by Chicago Ridge and defendant over the term of the IRS' occupancy of the Building.

| Events | Tax Year | Actual Taxes | Taxes Paid by Chicago Ridge | Taxes Paid by Defendant |
|---|---|---|---|---|
| Under construction | 2003 | $6,369.73 | $0.00 | $0.00 |
| Mid-year Complete | 2004 | $116,245.38 | $6,359.73 | $0.00 |
| | 2005 | $157,793.49 | $116,245.38 | $0.00 |
| | 2006 | $163,494.14 | $157,739.49 | $41,548.10 |
| | 2007 | $169,604.54 | $163,494.14 | $47,248.76 |
| IRS Vacates | 2008 | $175,837.60 | $169,604.54 | $0.00 |
| | 2009 | | | $0.00 |
| **Total** | | | | $88,796.86 |

Defendant contends that the first "full assessment" of the property did not occur until it was fully occupied in 2005 and that defendant, therefore, should not have reimbursed Chicago Ridge for any tax increase in 2006. Thereafter, in defendant's view, the base year tax should have been $157,793.49 (the assessment for 2005), not $116,245.38 (the assessment for 2004). By defendant's calculations, it should not have paid Chicago Ridge $88,796.86, as it owed only $20,519.06 for the entire term of occupancy.[45] Defendant seeks reimbursement in the amount of $68,277.80. Plaintiff denies these claims and, in addition, asserts that defendant owes it taxes of $53,359.16 for 2007 and some unidentified portion for 2008.

The parties did not negotiate an amount to reflect the base year taxes for the fully assessed property. Therefore, the "base year taxes" are the real estate taxes for "the first twelve-month period coincident with full assessment." *Sixth and E Assocs., LLC v. Gen. Serv. Admin.*, 09-2 B.C.A. ¶ 34,179 (2009). So when was the "full assessment" here? Defendant assumes, for this purpose, that the first "full assessment" of the property did not occur until January 1, 2005, because, prior to that date, the assessed value of the Building reflected an "occupancy factor" of 43.0 to 45.2 percent. But, defendant fails to explain how this occupancy factor worked, either in terms of its impact on the assessed value of the Building or on the calculation of the tax owed

---

[45] The latter figure sums up the difference in taxes between the base year and the Lease years for 2007 ($163,494.15 - $157,739.49 = $5,700.65), 2008 ($169,604.54 - $157,739.49 = $11,811.05) and the first two months of 2009 ($3,007.36).

thereon.[46]  This impact cannot be surmised.  For one thing, the occupancy rate does not correspond to when the IRS began moving into the Building – that move-in date of May 2004 (meaning that the building was occupied for eight months that year) in no way correlates to an annual occupancy rate of 43.0 to 45.2 percent.  Nor do the latter figures correspond to a ratable reduction in assessment – the amount of tax paid for 2004, $116,245.38, is not 43 percent of the amount paid for 2005, $157,793.49, but rather approximately 74 percent of the latter figure.

How the occupancy factor worked could be important here.  The mismatching of the figures listed above raises questions as to whether the "occupancy factor" temporarily reduced the assessed value of the property or was some form of a rebate that reduced the amount of tax that was owed thereon.  Several cases suggest this could make a difference under a clause like the one found in the Lease.  *See Bradley v. S.S. Kresge Co.*, 214 F.2d 692, 694 (7th Cir. 1954) (suggesting that a different result might occur under a tax escalation clause depending upon whether a tax increase was involved); *Design Studio Int'l, Inc. v. Chicago Title & Trust Co.*, 541 N.E. 2d 1166, 1169-70 (Ill. App. 1989) (same).  The record indicates that the assessed value of the property jumped from $462,983 in 2004 to $671,599 in 2005 – an increase that again does not correlate to the occupancy factor percentage, *i.e.*, $462,983 is not 43 percent of $671,599 ($288,787.57 is).  The Lease says nothing about an assessment not being "full" if the taxing jurisdiction reduces the assessment or tax rate for low occupancy, but rather states that an assessment is "full" if it reflects "all [the] contemplated improvements to the assessed property" and is not a "[p]artial assessment for newly constructed projects."

At least one interpretation of this clause suggests that the first "full assessment" of the Building occurred some time in 2004, at which point the twelve-month period in the tax clause was triggered.  But, that is not how defendant calculated the overpayment that it claims is due; instead, defendant assumes that no taxes were owed by defendant until 2007.  Plaintiff's parsing of these same provisions also comes up short.  It assumes that the taxes for 2004 represented a "full assessment," triggering a significant tax payment by defendant in 2006.  But, without more evidence, it would appear that a portion of the 2004 assessment likely related to the value of the Building before it was completed in May of 2004.  And, if that is true, neither the $462,983 assessed value of the Building for 2004, nor the $116,245.38 in taxes paid thereon, correspond to a "full assessment" that reflected "all [the] contemplated improvements to the assessed property."  In short, neither of the figures supplied by the parties can serve as the "base year" upon which further tax payments owed by defendant are calculated under the Lease.

Logic suggests that the amount of taxes properly charged to defendant lies somewhere in between the two amounts the parties claim – more than what defendant claims, but less than

---

[46]  In her expert report, Ms. Redding asserted that "[t]he first fully assessed year was 2005 according to tax data gathered and discussions with the Cook County Tax Assessor."  She attached to her report various tax bills for the property.  But, neither in her report nor in her testimony, did she provide any explanation as to how the occupancy factor impacted the calculations in those bills.  And this impact is apparent neither from the face of those documents nor from a table summarizing the tax bills included in Ms. Redding's report.

what plaintiff seeks.  Without knowing more about the calculation of the property tax here and how the occupancy factor affected that calculation, the court is in no position to determine whether the amount defendant has already paid is greater or lower than what it should have paid.  Contrary to what may be the parties' expectations, the court will not engage in an exercise of guesswork here.  While mathematical exactitude is not required in determining damages, *see Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 746 (2004), any recovery here must "be met by evidence and judicial findings, not by guesswork, or assumptions, or 'judicial knowledge' of crucially relevant facts, or by unproved probabilities or possibilities."  *Daniel v. Paul*, 395 U.S. 298, 309-310 (1969) (Black, J. dissenting); *see also Penn. R. Co. v. Chamberlain*, 288 U.S. 333, 342-43 (1933).  These are boundaries the court cannot transgress.  As such, the court finds that neither party has sustained its burden of proof on this issue.

## III.    CONCLUSION

Perspective is a highly underrated commodity.  Capturing that sentiment, Will Rogers, the cowboy philosopher, once said that "[e]verything is funny as long as it is happening to somebody else, but when it happen to you, why it seems to lose some of its humor, and if it keeps on happening, why the entire laughter kinder fades out of it."  Will Rogers, Warning to Jokers: Lay Off the Prince, in The Illiterate Digest I-3 75 (1974).

If we view this case from plaintiff's perspective, we see the loss of a valuable lease based upon leaks that affected only about ten of the offices and common areas in a large, two-story structure – one that was constructed specifically to suit the IRS' needs.  How can such simple defects, albeit lingering, be enough to allow defendant to walk away from the last six years of a ten-year lease, plaintiff asks?  From defendant's perspective, though, particularly from the perspective of the IRS employees who worked in the Building, and especially from the perspective of those who all-too-often found water dripping or raining down into their offices, break room and hallways, those same leaks did not seem so minor.  When they kept happening (over a period of years), they increasingly led to frustration, distraction and loss of productivity – or to put in terms of the Lease, the loss of "use and enjoyment."  Was this loss sufficient to warrant a default?  From its perspective – based upon the record as a whole and viewed through the prism of the rights and obligations created by the Lease – the court thinks so.

Based on the foregoing, the court finds that plaintiff is entitled to damages in the amount of $59,985.36.  The Clerk shall enter an appropriate judgment.  No costs.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge



Leaks at 5860 Chicago Ridge from 2005-2007

# CHICAGO RIDGE
# 2ND FLOOR



| Color | Leaks Occurring In: |
|---|---|
| Yellow | 2005 only |
| Pink | 2006 only |
| Blue | 2007 only |
| Orange | Multiple Years |